Joseph H. Malley (TX State Bar No: 12865900)
malleylaw@gmail.com
Law Office of Joseph H. Malley
1045 North Zang Blvd
Dallas, TX 75208
Telephone: (214) 943-6100
Facsimile: (214) 943-6170

*Attorney for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JANE DOE, TOBY CROSS; individually, and on behalf of a themselves and all others similarly situated individuals, | CASE No. |
| | JURY DEMAND |
| Plaintiffs, | COMPLAINT FOR: |
| V. | 1.  Violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721; |
| COMPACT INFORMATION SYSTEMS, INC., a Washington Corporation; DATA SOLUTIONS OF AMERICA, INC., a Florida Corporation; ELIZABETH M. BLANK, a Florida Individual; ENDURANCE WARRANTY SERVICES, a Illinois Corporation; KMB Statistics, LLC, a Florida Corporation; and Doe Individuals and Corporations 1-100 inclusive, | 2.  Violations of the State Motor Vehicle Records Disclosure Acts; |
| | 3.  Breach of Bailment; |
| | 4.  Conversion; |
| | 5.  Invasion of Privacy and Seclusion and Public Disclosure of Private Facts; |
| Defendants. | 6.  Negligence; |
| | 7.  Trespass to Personal Property / Chattels; and |
| | 8.  Unjust Enrichment |

Plaintiffs, Jane Doe and Toby Cross, on behalf of themselves and all others similarly situated, by and through their attorneys, Law Offices of Joseph H. Malley, P.C., as and for their complaint, and demanding trial by jury, allege as follows upon information and belief, based upon, *inter alia*, investigation conducted by and through their attorneys, which are alleged upon knowledge, bring this legal action against  Defendants Compact Information Systems, Inc., Data

Solutions of America, Inc., Elizabeth M. Blank, Endurance Warranty Services, KMB Statistics, LLC, and Doe Individuals and Corporations 1-100 inclusive. Plaintiffs' allegations as to themselves and their own actions, as set forth herein, are based upon their personal knowledge, and all other allegations are based upon information and belief pursuant to the investigations of counsel. Based upon such investigations, Plaintiffs believe that substantial evidentiary support exists for the allegations herein, or that such allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

The true names and capacities, whether individual, corporate, associate, director, officer, agent, its employees, officers, directors, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which it exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, of each of the Defendant Doe Individuals and Corporations 1-100 inclusive (hereinafter referred collectively to as "Doe"), are unknown to Plaintiffs at this time and therefore Plaintiffs sues Doe, by such fictitious names. Plaintiffs will ask leave of the Court to amend this complaint to show the true names and capacities of Doe when that information is ascertained. Plaintiffs are informed and believe, and thereon alleges, that each of the Defendants designated herein as a Doe are legally responsible in some manner, for the performance of the acts and omissions described below, and are liable for the events and happenings alleged and, in such manner, proximately caused harm to Plaintiffs as further alleged.

Defendants, and each of them, are individually sued as participants, co-conspirators, and aiders and abettors in the improper acts, plans, schemes, and transactions, including but not limited to acts, whether individual, corporate, associate, director, officer, agent, its employees,

officers, directors, legal representatives, heirs, assigns, successors, individual or corporate

entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether

wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint

ventures, franchises, operations under assumed names, websites, and entities over which it

exercises supervision or control, or group of individuals associated in fact, although not a legal

entity, or other legal entity, of each of the Defendants, that are the subject of this complaint.

## I.      NATURE OF THE ACTION

1.      Plaintiffs bring this consumer Class Action lawsuit pursuant to Federal Rules of

Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), on behalf of themselves and a proposed class of

similarly situated Individuals, (hereinafter referred to as "Class Members"), who were victims of

unfair, deceptive, and unlawful business practices; wherein their privacy and security rights,

were violated by Elizabeth M. Blank (hereinafter referred individually to as "Blank"), KMB

Statistics, LLC (hereinafter referred individually to as "KMB"), Data Solutions of America, Inc.

(hereinafter referred individually to as "DSOA"), and hereinafter referred collectively to as

"Blank Entities", and Compact Information Systems, Inc. (hereinafter referred to individually as

"CIS"), that acted independently, and in concert, and each knowingly authorized, directed,

ratified, approved, acquiesced, or participated, in conduct made the basis of this class action,

acting in a capacity best described as "Suppliers," acting independently, and in concert, with

Endurance Warranty Services (hereinafter referred to individually as "EWS"), and Doe

individuals and corporations 1-100 inclusive, (hereinafter referred individually to as Doe, and

collectively to with Endurance Warranty Services as "CIS Affiliates"), and each knowingly

authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of

this class action, in a capacity best described to as "Dealers", in acts that include one (1) or more

of the following:

1) Obtain, directly or indirectly, Plaintiffs' and Class Members' Motor Vehicle Records (hereinafter referred to as MVRs"), maintained by the State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act (hereinafter referred to as "DPPA");

2) Use, process, and re-disclose, Plaintiffs' and Class Members' MVRs for purposes that violate the DPPA;

3) Resell Plaintiffs' and Class Members' MVRs for purposes that violate DPPA;

4) Purchase, directly or indirectly, Plaintiffs' and Class Members' MVRs to market and solicit Plaintiffs' and Class Members', without their express consent, for purposes that violate the DPPA.

2.      The nature of this action includes a sequence of events wherein Defendants obtained, directly or indirectly, Plaintiffs' and Class Members' motor vehicle records from State Motor Vehicle Departments, for use in direct marketing and solicitation, without authorization and express consent, in order to perpetuate fraudulent activity that violated the Federal Driver Privacy Protection Act, and state driver privacy protection acts, referencing state laws implementing the Federal Driver's Privacy Protection Act within states, (hereinafter referred collectively to as "State Motor Vehicle Disclosure Acts"), perpetuating such activity in a heedless, willful, and wanton manner, knowingly disregarding the safety and privacy of Plaintiffs and Class Members, and on occasions, acting, or omitting to act, in a negligent manner.

3.      Defendants acted independently, and in concert, and each knowingly authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this class action. Defendants obtained Plaintiffs' and Class Members' MVRs to use, process, store, re-disclose, resell, and purchase Personal Identifying Information, derived in whole or part, from Plaintiffs' and Class Members' MVRs, maintained by the State Motor Vehicle Department in acts which include, but are not limited to, conducting, aiding and abetting, assisting, facilitating, participating in a pattern of conduct, an enterprise affecting interstate commerce, including as a Direct Market provider of MVRs, to market and solicit, directly or indirectly, Plaintiffs and Class

Members, without their express consent. Defendants accomplished such activity covertly, without actual notice or express consent, and which information Defendants obtained deceptively, for purposes which included Defendants' commercial gain and nefarious purposes.

4.     On information and belief, each Defendant used additional parties to commit such acts, made the basis of this action, individually and jointly, both intentionally and negligently, in whole or part, acting as a direct, or contributory party, to the action made the basis of this action. Pending discovery of such Affiliates' involvement, acts complained of, and made the basis of this complaint, Plaintiffs will amend the complaint to include such parties.

5.     Defendants Elizabeth M. Blank, KMB, DSOA, and CIS acting individually, and in concert, with Defendants' CIS Affiliates, have been systematically engaged in, and facilitated a covert operation of, in whole or part, the furtherance of a scheme to perpetuate an activity which included the marketing and solicitation of Plaintiffs and Class Members, without their express consent, violating the following:

1)     Violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721;

2)     Violations of the State Motor Vehicle Records Disclosure Acts;

3)     Breach of Bailment;

4)     Conversion;

5)     Invasion of Privacy and Seclusion and Public Disclosure of Private Facts;

6)     Negligence;

7)     Trespass to Personal Property / Chattels; and

8)     Unjust Enrichment

## II.     PARTIES

6.     Plaintiff Jane Doe is an individual residing in Manatee County, Florida. Jane Doe is concerned about revealing her actual identity since she is a survivor of a domestic abuse

relationship. Jane Doe moved to Florida to avoid the abusive relationship, desiring that her former predator not have the ability to locate, stalk, and abuse her again, which may occur if the former predator has any possible means to access her present physical address. Plaintiff Jane Doe is outraged by the privacy implications made the basis of this action, terrified for her safety, and that of her new family, fearing that her motor vehicle records, which include her present physical address, have been obtained, re-disclosed, resold, and purchased by Defendants, without her express consent, and that Defendants may permit her personal information to be obtained, re-disclosed, resold, and purchased by third parties that would make them accessible to entities that own and operate online websites that sell motor vehicle records to anyone that merely clicks a webpage button claiming that they possess a DPPA permissible use, an open access without any control, thus possibly accessible by her former predator.

7.     Jane Doe is a licensed and registered driver in the State of Florida. Plaintiff Doe's MVRs, includes name, address, VIN number, vehicle type, make, model, year, and license plate number. Plaintiffs' MVRs were obtained by Blank Entities and CIS, used, re-disclosed, resold, and purchased, directly or indirectly, by Defendant Endurance Warranty Services, within Florida, which resulted in marketing and solicitation letter being sent to Plaintiff Jane Doe by Defendant Endurance Warranty Services, without her express consent.

8.     Plaintiff Toby Cross is an individual residing in Anderson County, Texas, and is a licensed and registered driver in the State of Texas. Plaintiff Cross' motor vehicle records, includes name, address, VIN number, vehicle type, make, model, year, and license plate number. Plaintiffs' motor vehicle records were obtained by Blank Entities and CIS, used, re-disclosed, resold, and purchased by Defendant Endurance Warranty Services, within Texas, which resulted in a solicitation and marketing letter being sent to Plaintiff Cross by Defendant Endurance Warranty Services, without his express consent.

9.      Defendant Compact Information Systems, Inc., is a privately held Washington Corporation, headquartered at 7120 185th Ave NW, Suite 150, Redmond, Washington 98052, with offices in Florida and Texas. Defendant CIS has done business within the State of Texas during the Class Period.

10.      Defendant Data Solutions of America, Inc., was a Florida profit corporation which incorporated on September 9, 2003, and filed an administrative dissolution on September 28, 2012, partial dates within the Class Period. The President and registered agent was Elizabeth M. Blank, 913 SW 52nd Street, Cape Coral, Florida 33914, with a mailing and principal address of 1406 SE 46th Lane, Suite #5, Cape Coral, Florida 33904. On January 10, 2011, a profit corporation reinstatement was filed with the Florida Secretary of State, and noted its mailing address as a private mail box located at 1616-102 Cape Coral Pkwy PMB 135, Cape Coral, Florida 33914. Defendant Data Solutions of America, Inc. has done business within the State of Texas during the Class Period.

11.      Defendant Elizabeth M. Blank is an individual, and on information and belief, a resident of Florida within the Class Period. Defendant Blank provided the Florida Secretary of State the following addresses: 5311 SW 9th Place, Cape Coral, Florida 33914, 917 SE 26th Street, Cape Coral, Florida 33904, and 913 SW 52nd St., Cape Coral, Florida 33904, apparent residences. Defendant Blank has done business within the State of Texas during the Class Period.

12.      Defendant Endurance Warranty Service is a privately held Illinois Corporation, using "Endurance Direct" and "EWS" as assumed names, headquartered at 400 Skokie, # 105, Northbrook, IL 60062. Defendant EWS has done business within the State of Texas during the Class Period.

13.      Defendant KMB Statistics, LLC was a privately held Florida Corporation, reportedly headquartered at 5311 S.W. 9th Place, Cape Coral, Florida 33914, and 913 SW 52nd

Street, Cape Coral, Florida 33914. KMB registered with the Florida Department of State's Division of Corporations on December 23, 2007, recording initially the registered agent as Marilyn M. Blank, 5311 SW 9th Place, Cape Coral, Florida 33914, then changing the registered agents to Elizabeth Blank, 917 SE 26th St., Cape Coral, Florida 33904. The Limited Liability Company's annual reports filed with the Florida Secretary of State noted managing members/managers Marilyn M. Blank and Kenneth D. Blank, located at 5311 SW 9th Place, Cape Coral, Florida 33914, and Elizabeth Blank, located at 917 SE 26th St., Cape Coral, Florida 33904. Defendant Blank was President of KMB Statistics, LLC. On September 27, 2013, an administrative dissolution for KMB was filed. Defendant KMB Statistics, LLC has done business within the State of Texas during the Class Period.

### III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.

15.    This Court has jurisdiction over Defendant Compact Information Systems, Inc., a corporation which is headquartered in Washington, a citizen of the State of Washington, with offices and personnel located in Texas, doing business in Texas.

16.    This Court has jurisdiction over Defendant Data Solutions of America, Inc., a corporation which was headquartered in Florida, a citizen of the State of Florida, doing business in Texas.

17.    This court has jurisdiction over Defendant Elizabeth M. Blank, an individual, presumptively a citizen of the State of Florida, transferring motor vehicle records from Florida to Texas, directing such to the static IP address of 64.49.219.228 during the class period, doing business in Texas.

18.    This Court has jurisdiction over Defendant Endurance Warranty Services, a

corporation headquartered in Illinois, a citizen of the State of Illinois, doing business in Texas.

19.    This Court has jurisdiction over Defendants KMB Statistics, LLC, a corporation that was headquartered in Cape Coral, Florida, a citizen of the State of Florida, was doing business in Texas.

20.    Plaintiff Cross is a citizen and resident of Texas and assert claims on behalf of a proposed class whose members are domiciled throughout the fifty states and the U.S. territories. There is minimal diversity of citizenship between proposed Class Members and Defendants.

21.    This court has Federal question jurisdiction as the complaint alleges violations of the following:

        1)   Violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721;

22.    Venue is proper in this District under 28 U.S.C. §1391(b) and (c) against Defendants. A substantial portion of the events and conduct giving rise to the violations of law complained of herein occurred within this state, and within this district.

23.    Subject-matter jurisdiction exists in this Court related to this action pursuant to 28 U.S.C. § 1332.  The aggregate claims of Plaintiffs and the proposed Class Members exceed the sum or value of $5,000,000.00.

24.    Venue is proper in this district and vests jurisdiction in the State of Texas and Federal Courts in this district, the location of their principal activity made the basis of this action. Thus, mandatory jurisdiction in this U.S. District Court vests for any Class Member, wherever they reside, which occurred within the United States. The application of the law should be applied to any Class Member, made the basis of this action, anywhere within the United States, as if any and all activity occurred entirely in Texas and to a Texas resident. Thus, citizens and residents of all states are Class Members, for all purposes related to this instant Complaint, similarly situated with respect to their rights and claims as Texas residents, and therefore are appropriately included as Class Members, regardless of their residency, or wherever the activity

occurred made the basis of this action.

25.     Minimal diversity of citizenship exists in this action, providing jurisdiction as proper in the Court, since Defendants conducted activity within this state and in this district during the class period, and Plaintiffs include citizens and residents of this state and district, and assert claims on behalf of a proposed class whose members are scattered throughout the fifty states and the U.S. territories; thus there is minimal diversity of citizenship between proposed Class Members and the Defendants.

26.     This is the judicial district wherein the basis of the conduct complained of herein involving the Defendants was implemented, in whole or part.  The actual motor vehicle records were obtained from this state and then were used within the state and district; therefore all evidence of conduct as alleged in this complaint is located in this judicial district.

## IV.     PLAINTIFFS' EXPERIENCES

27.     Plaintiffs ("Plaintiffs") are United States residents that have experienced the same occurrences as each and every Plaintiff named herein. Class Members are United States residents that experienced the same occurrences as Plaintiffs:

a.     Plaintiffs have registered a motor vehicle with the Motor Vehicle Department within their state. During the Class Period. Plaintiffs were legally obligated to provide personal and sensitive identifying information within the motor vehicle information provided to the State Motor Vehicle Department for purposes required by law, in order to be legally able to operate their vehicle within their state, an obligation that did not require the release of such to any individual or corporation that did not possess legal rights to access their motor vehicle records;

b.     Plaintiffs' motor vehicle records were obtained by Defendants KMB and Blank, for direct marketing and solicitation, directly or indirectly, without notice or express consent;

c.     Plaintiffs were unaware that Defendants KMB and Blank had procured their

motor vehicle records for impermissible DPPA purposes;

d.      Plaintiffs were unaware that Defendants KMB and Blank used, re-disclosed, and resold their motor vehicle records to DSOA for impermissible DPPA purposes;

e.      Plaintiffs were unaware that Defendants KMB, Blank, and DSOA had procured their motor vehicle records, then used, re-disclosed, and sold their motor vehicle records to CIS for impermissible DPPA purposes;

f.      Plaintiffs were unaware that Defendant CIS had authorized, funded, and obtained directly their motor vehicle records from State Motor Vehicle Departments.

g.      Plaintiffs were unaware that Defendant CIS had procured their motor vehicle records, directly and indirectly, then used, re-disclosed, and resold their motor vehicle records to CIS Affiliates for impermissible DPPA purposes;

h.      Plaintiffs were unaware that Defendant CIS Affiliates had procured their motor vehicle records, then used and re-disclosed for impermissible DPPA purposes;

i.      Plaintiffs were unaware that Defendant Blank was acting as a conduit for CIS, in her capacity as President of KMB, custodian of motor vehicle records provided by the state, and as Vice President of Vehicle Division at CIS, permitting access to their motor vehicle records for impermissible DPPA purposes;

j.      Plaintiffs were unaware that Defendants KMB, Blank, DSOA, and CIS had acted independently, or in concert, and re-disclosed and resold their motor vehicle records to CIS Affiliates and Doe entities for impermissible DPPA purposes;

k.      Plaintiffs did not provide express consent to the use of their motor vehicle records by Defendants for purposes that included direct marketing and solicitation;

l.      Plaintiffs had one (1) or more of the CIS Affiliates send them a letter to directly market and solicit, data derived in whole or part, from Plaintiffs' and Class Members' motor

vehicle records;

m.      Plaintiffs could not have learned about Defendants' access to their motor vehicle records except through unreasonably burdensome efforts, such as those required in the investigation underlying these allegations;

n.      Plaintiffs became the victims of privacy and security violations due to Defendants' unauthorized access to, and use of, their motor vehicle records, actions based solely on Defendants' attempt to use such for commercial gains;

o.      Plaintiffs' explicit interest is to maintain the privacy of their motor vehicle records; however Defendants continue to possess, use, re-disclose, resell, and purchase such data;

p.      Plaintiffs and Class Members have standing to bring this case under Article III of the United States Constitution. Plaintiffs and Class Members have standing by virtue of alleging concrete, tangible, and non-speculative injuries in fact, arising from violations of Federal Statutes. The law at issue herein create legal rights, the invasion of which creates standing. Plaintiffs and the Class Members are within the zone of persons sought to be protected by these laws, and if such parties cannot protect such interests and seek either remuneration or injunctive relief, they would have no mechanism available to hold Defendant accountable for such misconduct;

q.      Plaintiffs and Class Members have each suffered harm and as a result of Defendants' actions. Such losses constitute classic Article III injuries in terms of an uncompensated loss for which this Court can provide redress.

r.      Plaintiffs seek to have Defendants cease its unauthorized activities, seek remedies to obligate Defendants to discontinue such unauthorized activities in the future, provide notice of any and all uses of their motor vehicle records obtained thereof, obligate Defendants to destroy

all such motor vehicle records, and recover damages.

## V.   STATEMENT OF FACTS

### A. <u>Introduction</u>





28.     For all consumers that have ever been harassed by telephone calls and letters selling auto warranties, wondered how these companies knew their Personal Identifying Information, including but not limited to, their name and address associated with the make, model, and year of their vehicle, had concerns that their home address was publicly being sold and possibly targeted, feared that their family's security was at risk and privacy violated, this class action will identify a source used to obtain this personal information and implement such unauthorized activities, and the elements of a business enterprise, implemented in whole or part by Defendants: obtaining State Motor Vehicle records, directly or indirectly, then re-disclosing, re-selling, and/or purchasing motor vehicle records ("MVRs"), to aid and abet in direct

marketing and solicitation, without the individuals' express consent, a violation of the Driver's Privacy Protection Act ("DPPA").

29.     This class action relates only to activities that involve obtaining Plaintiffs' and Class Members' motor vehicle records, obtained impermissibly from the State Department of Motor Vehicles, then used, re-disclosed, resold, and purchased for purposes that involve direct marketing and solicitation of Plaintiffs and Class Members, without their express consent, a violation of the Driver's Privacy Protection Act (DPPA), 18 U.S.C. §2721 et seq. This class action does not relate to the deceptive, misleading, and fraudulent activity involved in the sale or service of purchased Vehicle Service Contracts ("VSCs") and Third Party Auto Warranties.

30.     The VSC and Third Party Auto Warranty Industry is the poster child for marketing abuses, illegal telemarketing, and deceptive mailers. It is a complex financial infrastructure, funded by a multitude of financial institutions. The core of this industry is "fueled" by illegally obtaining millions of motor vehicle records from State Motor Vehicle Departments to use as direct marketing and solicitation leads, without the consumer's express consent, disregarding the limitations on access:

> "Vehicle data can be tricky to compile and to source online – there are lots of laws and amendments to laws that cover the use of vehicle data and how it may be used… But rest assured, our list is 100% "permission-able use" (compliant with regulations) and our Automotive List team are experts in all the ins and outs, whys and how's of using the information to its fullest."

Compact Information Systems, "Compact now offers coast to coast customer service", 2011 / February, (last accessed October 28, 2013), online: http://www.compactlists.com/2011/02/.

31.     State Attorney Generals investigating VSC and Third Party Auto Warranty companies' generally concentrate its consumer investigation on illegal deceptive sale and service practices, omitting investigations directed at impermissible DPPA motor vehicle record access, acts which provide the "grease" by obtaining lead generation databases to create and send marketing letters.

32.     The Defendant's interest to obtain motor vehicle records exists because auto data compiled from State Motor Vehicle databases provide a wealth of data that is used for direct marketing and solicitation leads, albeit data obtained in violation of the DPPA. Millions of current motor vehicle records can be obtained from States on a continuous basis for a nominal fee. Texas alone reportedly sells thirty three million motor vehicle registration and title records to a multitude of Bulk Requestors on a monthly basis. Entities initially obtain the entire database of all records and then receive updates periodically. Entities that obtain motor vehicle records from the State Motor Vehicle Department for direct marketing and solicitation purposes claim DPPA permissible purposes, obtaining millions of motor vehicle records for a fee that equates merely to the cost to purchase one (1) Extended Auto Warranty or Vehicle Service Contract, a sum of about four thousand dollars ($4,000.00). Bulk Requestors are willing to ignore the legal implications of the DPPA by providing false and misleading information to the State Motor Vehicle Departments that review its business practices prior to release of the motor vehicle records. Bulk Requestors then resell the motor vehicle records to entities involved in the direct marketing and solicitation industry, avoiding State Motor Vehicle Department detection:

"**The Complexities of Auto Data Compilation**

After a bunch of research lasting many months I've reached the conclusion there are only 5 major suppliers of auto data in the United States, which makes our recent acquisition of Data Solutions of America even more appetizing! Auto data is incredibly complicated to compile. The various governmental entities that have auto data have their own individual set of rules, and no one is able to really get their arms around the entirety of the data compilation paradigm in this space. The biggest and most well-known provider (names have been excluded here) actually models their data in order to create a national file.

A couple of compilers have "real" data, which is typically collected from after-market service and maintenance auto care providers, warranty data, insurance info, various types of promotions run by manufacturers, state government sources and driver data. Then there are those who compile using online sources and various other means, that not even I'm sure about! Our Compact National Auto List compilation methodology fits firmly in the "real" data category. We compile from the various sources

listed above. As we move forward preparing the file to be hosted on www.compactlists.com, our web portal, we are discovering firsthand just how intricate all aspects of this endeavor are, from the legislative side of things (with the Driver Privacy Protection Act and subsequent Shelby Bill Amendment) to the Boolean logic and business rules required to provide you, the end user, with a site that makes sense and delivers on what the data can offer.

The bottom line is that now I understand fully why there are so few national auto data providers! This is not an easy subject to master, and Compact is using all of its rich 22 year history, and highly experienced data processing and programming staff, to launch the Compact National Auto List – hopefully in the third final of March. When the site does go live our goal is to simplify the complex nature of auto data purchasing by being the first compiler to host a "real" auto data file on a feature rich mapping platform. Be sure to try the CNAL product when it goes live to see if we achieve our worthy goal.

Cheers Rich
Rich Lancaster
CEO"

Compact Information Systems, Rich Lancaster, "The Complexities of Auto Data Compilation" 2011 February 04, (last accessed November 19, 2013), online: http://www.compactlists.com/2011/02/04/the-complexities-of-auto-data-compilation/.

33.     The protections afforded consumers by the Driver's Privacy Protection Act is premised on a screening process limiting access to their motor vehicle records, an obligation also imposed on any and all individuals and entities that obtain, re-disclose, and resell such data. The DPPA imposes a duty on sellers, beginning with the State, to exercise reasonable care in responding to requests to purchase the motor vehicle records. This duty is then transferred to individuals or entities that have obtained the motor vehicle records when they are re-disclosing and/or reselling the motor vehicle records. Such duty also exists for entities purchasing the motor vehicle records from individuals or entities in possession or MVRs, a duty that includes, but is not limited to, exercising reasonable care to confirm the authority of the reseller to possess the motor vehicle records for resale. Individuals and entities that obtain, use, re-disclose, resell, and purchase the motor vehicle records must follow screening policies and reasonable verification measures. Defendants were either negligent, or totally disregarded such duty intentionally.

34.     The DPPA's primary purpose is to protect the privacy and safety of all consumers that have provided information to the DMV, including Identification Cards issued to minor children and elderly, and a document within motor vehicle records sold to bulk requestors:

> "Here's a real-life example of why audience is so important. A friend's 89-year-old mother recently visited the Department of Motor Vehicles (DMV) to get a photo ID. She no longer drives, but still needs an ID, and the DMV is the place to go for that. Local car dealers have access to some DMV information. This woman's name and address popped up on the list of individuals recently visiting the DMV. As a result, she began receiving offers for new cars. The (false) assumption made by local dealers was that she'd been to the DMV to get a driver's license. That direct mail effort had a ZERO percent chance of success. And it has nothing to do with credit mail being "old" technology."

James Ravetti, TMR's Direct Mail and Marketing Blog, "Why Your Direct Mail Isn't Working (Hint: It's Not Due To Old Technology)", February 7, 2013, (last accessed November 8, 2013), online: http://info.tmrdirect.com/bid/113309/Why-Your-Direct-Mail-Ins-t-Working-Hint-Its-Not-Due-To-Old-Technology.

35.     The extended auto warranty and vehicle service contract industry that is involved with accessing and using motor vehicle records for impermissible purposes, exists at the "cost" of the consumer's privacy and security, creating a reasonable fear of present and future injury to consumers, especially Domestic Violence Victims, compelling abuse victims to take costly and burdensome measures to protect their privileged information from risk of access and probable harm. Some abuse victims attempt to avoid abuse by relocating their residence, apparently an act done in vain by Jane Doe. Once a domestic abusive victim attempts to flee to a new location, even if within the same state, they are legally obligated to notify the State Motor Vehicle Department of their change of address. Since available motor vehicle records can be obtained via a multitude of websites online for a nominal fee merely by the requesting party clicking a form response that they possess a DPPA permissible use, the abuse victims have a false sense of security since they have no knowledge that their motor vehicle records are "for sale". Kristi Dyroff, an advocate with the National Organization for Victim Assistance, discussed the consequences to abuse victims from the improper access to motor vehicle records:

Kristy Dyroff, National Organization for Victim Assistance, "DPPA fails to provide protection for crime victims", October 30, 2013, (last accessed November 12, 2013), online: http://www.trynova.org/category/nove-blog.

## B. **Defendants' Business Practices and Associations**

36.     Defendants acted independently, and in concert, and each knowingly authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this Class Action, in acts which include, but are not limited to, conducting, aiding and abetting, assisting, facilitating, participating, in a pattern of conduct, an enterprise affecting interstate commerce, to obtain motor vehicle records from State Motor Vehicle Departments, directly or indirectly, in order to use, re-disclose, resell, and purchase, for purposes that involve marketing and solicitation of Plaintiffs' and Class Members' motor vehicle records, without their express consent, as evidenced by the Defendants' business practices and associations.

37.     Defendant Blank is an individual involved in the Direct Marketing business, acts as a Direct Market provider specializing in Direct Mail Targeted Lists, and provides assistance to Direct Marketing entities. Defendant Blank owned KMB Statistics, LLC, and Defendant Data Solutions of America, Inc.

38.     Defendant KMB Statistics, LLC, was a corporation involved in the Direct Marketing business, acted as a Direct Market provider specializing in Direct Mail Targeted Lists, and provided assistance to Direct Marketing entities.

39.     Defendant Blank, as President of KMB Statistics, LLC, entered into a purchase agreement on March 18, 2009 with the Texas Department of Motor Vehicles to obtain the Texas Motor Vehicle Registration database on a continuous and repeated basis. This agreement was terminated on November 30, 2011, violations of the DPPA.

40.     Defendant Blank, as President of KMB Statistics, LLC, entered into a purchase agreement on May 15, 2009 with the Florida Department of Highway Safety and Motor Vehicle

to obtain the Florida Motor Vehicle registration database on a continuous and repeated basis.

This agreement was terminated on May 14, 2012.

41.    Defendant Data Solutions of America, Inc., was a corporation involved in the

Direct Marketing business, acted as a Direct Market provider specializing in Direct Mail

Targeted Lists, and provided assistance to Direct Marketing entities.

42.    Defendant Data Solutions of America, Inc.'s website, http://www.DSOAi.com is

no longer active, but an online archive described the company's description:

> "The Data Solutions of America team brings together over 20 years of
> direct marketing experience and list selection experience. We work
> directly with Marketing Companies, Mail Shops and Advertising Agencies
> offering competitive rates and access to the most current and accurate data
> this industry has to offer.
>
> Data is just not data! All databases are not created equally. Each source
> has certain nuances based on their compilation methods and databases
> management that can significantly affect…"

The Wayback Machine, (last accessed October 10, 2013), online:
http://www.web.archive.org/web/20101114010259/http://DSOAi.com/about.html.

43.    Defendant Compact Information Systems is a company involved in the Direct

Marketing business, acts as a Direct Market Provider specializing in Direct mail targeted lists,

and provides assistance to Direct Marketing entities.

44.    Defendant Compact Information Systems' website: http://www.compactlists.com

describes the following business plan:

> "Our mission is to drive the most sophisticated, online, direct marketing
> tools in to the hands of our customers – and to enable them to produce the
> most effective direct marketing campaigns through the use of the highest
> quality lists available on the market today. At Compact we believe the
> combination of our GEO-Direct technology and the accuracy and quality
> of our lists provide you with the very best solutions available"

Compact Information Systems, "About Compact Information Systems", 2013, (last accessed
October 24, 2013), online: http://www.compactlists.com/about-compact/.

45.    Defendant Blank, as President of Data Solutions of America, Inc., entered into a

purchase agreement in February 2011 with Defendant Compact Information Systems:

> "In February 2011 Compact announced the acquisition of Data Solutions of America, Cape Coral, FL, and their vehicle database. This new data, now called the Compact National Auto List, will go live on the web portal in late February 2011."

LinkedIn, "About Compact Information Systems, Inc.", (last accessed November 8, 2013), online: http://www.linkedin.com/company/compact-information-systems-inc.

46.     Compact Information Systems' acquisition of Data Solutions of America ("DSOA"), an acquisition that did not include KMB, included the hiring of Defendant Blank and staff. Compact Information Systems provided a public release wherein it noted Data Solutions of America as a Leading National provider of Auto Data, an industry leader in compiling vehicle data for direct marketing purposes. Compact Information Systems also noted that Data Solutions of America's "Auto file" would be branded as "Compact National Auto List", and available through an electronic portal online at www.compactlists.com. Compact Information Systems also reinforced that Data Solutions of America's "Auto data customers" should expect "no change". Data Solutions of America's "National Auto List" was a described as a unique product, unavailable anywhere else in the industry. The reason for this "uniqueness" though provided the basis of this class action:

> "Compact now offers coast to coast customer service
>
> With Compacts acquisition of Data Solutions of America (DSOA) we have acquired a sales and service office in Cape Coral, Florida – which now completes our coast to coast customer service offering to all of our clients. We will soon have all of our customer service reps trained up on all of our new products, as well as the new CSR's in Florida trained up on Compacts core database products. Customers will be able to call any office during standard business hours for that time zone and receive excellent service.
>
> We are so excited about the launch of the Compact National Auto List (CNAL), customers can purchase the list by contacting us directly for the time being, and then in a few short weeks the data will go live on the Compact Consumer List website.

Vehicle data can be tricky to compile and to source online – there are lots of laws and amendments to laws that cover the use of vehicle data and how it may be used… But rest assured, our list is 100% "permission-able use" (compliant with regulations) and our Automotive List team are experts in all the ins and outs, whys and how's of using the information to its fullest.

If you want information on CNAL or any other Compact product or service don't hesitate to ask us, whether you are on the east coast, west coast or in the middle of the country, there is an office in your time zone!

Mary McCarty
List Services Manager"

Compact Information Systems, Mary McCarty, "Compact now offers coast to coast customer service", 2011 February 04, (last accessed November 11, 2013), online: http://www.compactlists.com/2011/02/.

47.    Defendant Blank's association, employment, and contractual obligations within the Class Period, reportedly occurring concurrently, included the following:

1.   President of KMB Statistics, LLC, headquartered at 5311 S.W. 9th Place, Cape Coral, Florida 33914, (239) 691-3084;

2.   Legal Representative of KMB Statistics, LLC that entered into a contract with the State of Texas to obtain millions of motor vehicle records on a continuous basis;

3.   Legal Representative of KMB Statistics, LLC that entered into a contract with the State of Florida to obtain millions of motor vehicle records on a continuous basis;

4.   President of Data Solutions of America, Inc., 1406 S.E. 46th Lane, Suite #5, Cape Coral, Florida 33904, (239) 540-2992;

5.   VP of Vehicle Division at Compact Information Systems, Inc., located at 7120 185th Ave NE, Redmond, Washington 98052;

6.   Registered Agent for Compact Information Systems, Inc., a Florida foreign profit corporation, principal address: 7120 185th Ave NE, Redmond, Washington 98052, registered Agent's address: 917 SE 26th St., Cape Coral, Florida 33904, an apparent residence.

48.    Defendant Compact Information Systems compiles and aggregates consumer databases, including auto and real estate data. The use of real estate data derived from a state's motor vehicle record databases can be used for marketing and solicitation of home warranties, a

common area of business many entities marketing and soliciting auto warranties also are involved in, and common for lending entities, Fidelity Fed. Bank & Trust v. Kehoe, 547 U.S. 1051, 126 S.Ct. 1612, 164 L.Ed.2d 353 (2006).

49.     Defendant Compact Information Systems providing a self-service online count and order platform for data analysis, reportedly selling billions of records to online customers with the business objective, "to satisfy all your Direct Marketing needs," and describes its business:

> "Improving the Way You Prospect with Our Direct Marketing Lists
>
> Over the last year, Compact has focused on developing a comprehensive set of Consumer, Auto, and Business list prospecting tools, enabling users to quickly and accurately target their next mailing.
>
> Compact continues to focus on innovating in the marketplace and driving features to improve user experience and to facilitate list creation. Simple interfaces for complicated tasks have further empowered our users to build the list they want to target their exact market.
>
> The features and tools that Compact has built into the platforms have had the benefit of Compact and its partners' extensive experience in the mailing industry. The combined experience that Compact draws from is unrivaled in the industry, and is how we continue to deliver the best to our users.
>
> Speed of access has always been a point of emphasis, and Compact has invested heavily in new tools available to few others in the industry to improve count and report access times. Compact is focused on continuing to improve the performance of our direct marketing list platforms, and over the next few months, the results of that work will become evident.
>
> Compact is dedicated to providing the best to its users, in service,"

Compact Information Systems, "Improving the Way You Prospect with Our Direct Marketing Lists," July 11, 2011, (last accessed October 9, 2013), online: http://www.compactlists.com/2011/07/11/improving-the-way-you-prospect-with-our-direct-marketing-lists/.

50.     The "Compact National Auto List", a consumer data compilation, derived in whole or part from DSOA's "National Auto List" database, provided "unique data", and the ability to formulate complex "selects" by prospective vendors:

"Sleepless Nights: Compact National Auto List

Compact's acquisition of Data Solutions of America brings the much-anticipated Automotive, Boating, and Motorcycle selections to the Compact Consumer List (CCL) and the new Compact National Auto List (CNAL).

Together, our developers and compilers are using Compact's unique data expertise to bring to our clients the most complex selects with our traditional attention to ease-of-use, speed, and accuracy. The challenges associated with bringing CNAL to market have precipitated sleepless nights for Compact developers, but we're committed to being the best, to offering the best, to innovate and drive Compact to heights long-dismissed as impossible by our competitors.

The anticipated launch of CNAL is an exciting time for employees and customers alike, and as with our previous product launches, Compact is guaranteed to impress. The combination of expertise, technology, and talent will continue to drive Compact forward; sleepless nights translate to new features; and our clients will always experience only the best.

Eric Baum
Director of Application Development

You can leave a response, or trackback from your own site.

2 Responses to "Sleepless Nights: Compact National Auto List"



Steve Nyrhinen said:

model year are 1994-2009 for Acura, Honda, Toyota, Lexus, and Scion.

The zips are 80915, 80917, 80918, 80920, 80922, 80923..

I need counts and pricing please.

Steve Nyrhinen 719.955.4232

May 31st, 2011 at 13:01"

Compact Information Systems, Eric Baum, "Sleepless Nights: Compact National Auto List", 2011 February 07, (last accessed November 11, 2013), online: http://www.compactlists.com/2011/02/07/sleepless-nights-compact-national-auto-list/.

51.   On August 2, 2011, a date within the class period, Compact Information Systems

acquired AccuData Holdings, Inc. as a subsidiary. AccuData Holdings, Inc., does business as

AccuData America and AccuData Integrated Marketing, headquartered at 5220 Summerlin

Commons Boulevard, Suite 200, Fort Myers, Florida 33907. These entities reportedly provide

database marketing services, offering data resources such as Direct Marketing leads:

> "About AccuData Integrated Marketing
>
> SUPERIOR DATA RESOURCES, ANALYTICS & DATABASE
> TECHNOLOGY TO MEET DIRECT MARKETING OBJECTIVES
>
> Like many of our competitors, AccuData® began as a mailing list
> company. But over the years, we significantly upgraded and expanded our
> offerings to provide a comprehensive range of the most advanced and
> cost-effective marketing services available.
>
> While AccuData continues to offer extensive selections of targeted
> mailing lists, we've grown into a marketing analytics and database
> marketing technology leader as well — and we've held that distinction for
> over 20 years.
>
> Of course, we do provide every targeted mailing list under the sun for
> generating sales leads, including everything from consumer mailing lists
> to business mailing lists, B2B mailing lists, email address lists and much
> more. But we also offer powerful marketing analytics and advanced
> database marketing technology to help marketers target their best
> consumers and find prospects just like them.
>
> Expert help for your direct marketing needs
>
> What else sets AccuData apart? Our commitment to working in
> partnership with you to enhance your integrated marketing campaigns. We
> promise that we will do everything possible to help you grow your
> business. Our integrated marketing services will help you boost
> effectiveness and ROI across email, ecommerce and direct mail initiatives.
>
> Specialties marketing, mailing lists, data, advertising, database, email
> marketing"

AccuData Integrated Marketing, Products & Services, "SUPERIOR DATA RESOURCES,
ANALYTICS & DATABASE TECHNOLOGY TO MEET YOUR DIRECT MARKETING
OBJECTIVES", (last accessed November 7, 2013), online:
http://www.linkedin.com/company/accudata-integrated-marketing/products.

52.     On March 5, 2012, a date within the Class Period, Compact Information Systems

acquired DaVinci Marketing Technologies, an additional entity involved as a involved Direct

Marketing provider specializing in targeted leads:

> **"DaVinci to become part of AccuData Integrated Marketing, Driving the Technology Growth Strategy March 5, 2012**
>
> FORT MYERS, FL— MARCH 6, 2012 — DaVinci Marketing Technologies, a direct marketing technology service provider, signed an acquisition agreement today with Compact Information Systems. DaVinci will now become part of the AccuData Integrated Marketing operating division, a wholly owned subsidiary of Compact.
>
> About DaVinci
>
> DaVinci Marketing Technologies is at the forefront of the Email Service Provider (ESP) industry. Its self-service ESP platform allows the use of CRM emails and acquisition emails using purchased or rented email lists. DaVinci enables email list management for targeted email communications to prospects and customers using geographic and demographic variables."

"DaVinci Marketing Technologies Signs Acquisition Agreement with Compact Information Systems" (March 5, 2012) last accessed online at: http://www.accudata.com/2012/03/05/davinci-marketing-technologies-signs-acquisition-agreement-compact-information-systems/.

53.     Defendant Endurance Warranty Services is a company that is involved in the Direct Marketing business, acts as a Direct Market Broker specializing in direct mail marketing and solicitation of Third Party Auto Warranties and Vehicle Service Contracts, and is provided assistance from direct marketing providers.

54.     Defendant Endurance Warranty Services is the domain registrant for the website: http://www.autoservicewarranty.com and http://www.endurancewarranty.com, which describes its business as follows: "endurance is a nationally recognized automotive service contract provider. Endurance provides automotive service contracts direct to consumers whose auto manufacturer's factory warranty has expired or is about to expire".

55.     Defendant Endurance Warranty Services' marketing and solicitation correspondence includes its headquarters' address as the return address and the telephone number (800) 442-5552. The individual's vehicle information is included on the envelope. Endurance Warranty Services' correspondence is sent with United States Postal permit number

1781 from Northbrook, Illinois. Century Automotive Service Corporation, Enterprise Financial Group, and Interstate National Dealer is noted within the correspondence as its VSC's administrators.

56.     In order to summarize Defendants' business associations and practices in a plain, simple, and concise manner: DIRECT MARKETING representative (Blank) signed a contract on behalf of a DIRECT MARKETING company (KMB), which then re-disclosed the motor vehicle records to a DIRECT MARKETING company (DSOA), which then resold the motor vehicle records to a DIRECT MARKETING company (CIS), which then resold the motor vehicle records to EWS, a DIRECT MARKETING company, and to additional DIRECT MARKETING companies (Doe), in order to conduct DIRECT MARKETING of Plaintiffs and Class Members, without their express consent. To summarize the effects of Defendant's activities: Violations of the Driver's Privacy Protection Act.

### C. <u>Anatomy of Vehicle Service Contract – Third Party Auto Warranty Industry</u>

57.     In order to fully outline the activities of the Defendants, made the basis of this action, an understanding of Vehicle Service Contract and Third Party Warranty Industry is necessary, including knowing the product sold, participants, and the participants' functions. Vehicle Service Contracts and Third Party Warranties are the products, hereinafter referred collectively to as "VSCs". Although many people use the term "extended auto warranty", to describe a Vehicle Service Contract, the term is a misnomer, and they in fact are quite different from traditional warranties. A Vehicle Service Contract is an agreement by a third party to pay for the costs of repairing the consumer's vehicle. It is different than an automobile warranty, which is offered by the automobile manufacturer at the time of sale. A third party warranty is also not similar to a manufacturer's first party extended warranty, which uses original parts and factory-trained technicians to repair a vehicle at a dealership. Such description of the product

exists to deceive prospective purchasers of Vehicle Service Contracts and Third Party Warranties.

58.     There are usually at least six principal participants in a VSC Industry: (1) the consumer who purchases the VSC (the "Consumer"), (2) the dealer that markets the VSC to the consumer (the "Dealer"), (3) the administrator that develops and administers the VSC itself and is the party obligated to reimburse the cost of covered repairs (the "Administrator"), (4) the risk retention group that guarantees to pay covered claims if the Administrator does not satisfy its obligation to the Consumer (the "Insurer"), and (5) the financing organization that enables the Consumer to pay for the VSC (the "Financing Organization"). The sixth principal participant is, "the supplier," referencing individuals and entities that supply the leads originating from sources that include obtaining state motor vehicle records, and is the activity thereof that makes the basis of this action.

59.     The VSC Industry is basically nothing more than a massive pyramid-like scheme, employing financial instruments to vertically integrate an association of entities requiring a "lead supply chain". A state's MVR database provides the most accurate and updated database of all licensed drivers and vehicles, providing a marketing database surpassing all other sources. As such, the VSC industry is involved with any and all means possible, at any costs, ignoring legal constraints, to procure this database. Once the database is obtained then the marketing and solicitation scheme can be implemented.

60.     The typical VSC transaction begins with consumers being first contacted by the "Dealer," who acting as the agent for the Administrator, is the primary point of contact for the sale. VSC Dealers, use different media to market and sell VSCs to consumers, including direct mailings, and robo-calling. Due to recent State and Federal actions, robo-calling has all but ceased. VSCs are generally marketed and sold to individuals with older cars, or with higher

mileage on their existing vehicles, who could not afford to purchase a newer vehicle. Data processing companies, using filter analytic entities, filter specific criteria from the MVR databases.

61.     Consumers generally buy VSCs because they are misled into believing that they are buying an extended warranty on their vehicles, VSC Dealers attempt to sell and market VSC's in a false, deceptive, and misleading manner, including the following methods:

1.  Representing that a consumer's motor vehicle warranty has expired, or is about to expire, when such statement is not true or cannot be substantiated;

2.  Misrepresenting the nature of the vehicle service contract as a "warranty," "factory warranty," or "extended warranty," when in fact the product being sold is not a "warranty," "factory warranty," or "extended warranty";

3.  Representing that Defendants had pre-existing relationship with a consumer when such a relationship did not exist;

62.     The dealer can operate many companies, filing multiple corporations with different names, and changing business location and telephone numbers periodically to avoid detection when problems occur, continuing to maintain the symbiotic relationship with administrators that are fully aware of the reasons for such activities.

63.     Once the consumer agrees to purchase a VSC, the consumer usually makes a down payment of at least 5% of the cost of the VSC (the "Down Payment") by using a credit or debit card. After making the Down Payment, the consumer receives a packet of materials, including a copy of the VSC, and payment information. The dealer is not a party to the VSC, it is an agreement between the administrator and consumer. As part of the sales transaction, the consumer is provided with the option of paying for the product through a monthly payment plan with finance company (the "Payment Plan Agreement" or "PPA"). The PPA is an agreement between the consumer, finance company, and the Administrator.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

64.     The VSCs are designed by Administrators and insurance companies who also provide insurance for claims made by VSC customers under their VSCs. The Administrators adjudicate and pay claims submitted by the VSC customer. In order to circumvent the application of stringent state insurance laws, VSCs are cancelable at any time.

65.     The finance company's only role in the Vehicle Service Contract (VSC) industry – is the acquisition and servicing of payment plans originated by sellers of those VSCs. The finance company acquires the payment plans originated by the sellers of the VSCs (the "Sellers"). In consideration for the payment plan, the finance company pays both the Seller and the Administrator.

66.     The finance company's role in the VSC sales process is a crucial source of liquidity for the various VSC parties. Upon the payment of the first monthly installment by the consumer, the finance company advances to the MVR Dealer the balance of its commission due on the sale of the VSC (this amount is referred to as the "Dealer Profit").

67.     The finance company also refrains from advancing (i.e., holdback) a portion of the Dealer profit if there is a failure to repay money owed due to a cancellation of a VSC ("Holdback Reserves").

68.     If the purchaser of a VSC cancels the VSC before making all payments required under the payment plan, there is an obligation to repay the finance company the "unearned" portion of the Dealer Profit that the finance company had previously advanced in connection with the purchase of that VSC (the "Dealer Refund").

69.     Everyone involved in the VSC transaction, except, of course, the consumer, knows that the Administrator is not actually going to pay for any repairs, routinely and unreasonably denying claims for repair. According to a May 2011 Better Business Bureau ("BBB") VSC industry study, Administrators denied over 93% of the claims made.

70.     Most consumers do not fall prey to the illegal and unethical activities of the Defendant's CIS Affiliates' sales practices; however all consumers fall prey to the Defendant's privacy and security violations by having their motor vehicle records accessed without their express consent, a deceptive practice that remained cloaked until a random request for information from the TxDMV revealed Defendant KMB and Blank's activities which provided a "roadmap" to associations between Defendants.

### D. "Direct Marketing Stalkers" – WE KNOW WHERE YOU LIVE!

71.     Due to the multitude of direct marketing letters soliciting auto warranties and VSC's sent within the Texas region in the past eighteen (18) months, and requests for assistance by consumers concerned about access to their Personal Identifying Information contained in such letters, Freedom of Information Act ("F.O.I.A.") requests were sent to all State Motor Vehicle Departments. The responses to the F.O.I.A.'s revealed the parties that had obtained the motor vehicle records in bulk, but provided no records about entities obtaining the motor vehicle records, directly or indirectly, from the bulk requestors.

72.     The investigation to determine any and all individuals and entities involved in the unauthorized procurement, use, re-disclosure, resale, and purchase of motor vehicle records is a difficult process because motor vehicle records are often aggregated with additional data then redistributed to a multitude of third parties, thus any attempt to identify all parties within all of the hypothetical distribution "phases" is impractical. This inability to identify all hypothetical phases of the motor vehicle records distribution network, from the initial sale by the state to any and all individuals and entities obtaining, using, re-disclosing, reselling and purchasing the motor vehicle records, provides an ability to conceal DPPA violations. While the identity of participants in two (2) of the hypothetical phases of the MVR distribution network can be obtained, such as those involved in the procurement of the motor vehicle records from the state

to the bulk requester, referencing "Phase 1- Bulk Requester", as can be the entities involved in mailing marketing letters to consumers, referencing "Phase 4- Dealer", the resale from bulk requester to Direct Marketing providers, referencing "Phase 2- Data Mining", and resale from Direct Marketing providers to Direct Marketers, referencing "Phase 3- Direct Marketers" is generally undiscoverable. This class action though discovered the proof of all participants, and the interaction thereof, within all four (4) hypothetical phases of motor vehicle record procurement: obatainment, re-disclosure, purchase, and marketing, thus enhancing the impermissible DPPA uses.

73.     The reasons for an inability to dissect a hypothetical motor vehicle record distribution network is because many bulk requestors that obtain state motor vehicle records falsely claim DPPA permissible uses, or claim one (1) legitimate DPPA use, then use the motor vehicle records for non-legitimate purposes. Data mining entities obtain the motor vehicle records from bulk requestors then resell the motor vehicle records to a multitude of entities also without a DPPA permissible purpose. This inability to prove impermissible uses in all phases of MVR distribution has also been the flaw in all failed DPPA class actions related to the unauthorized access to motor vehicle records. Courts generally fail to allow discovery, focusing on interpreting the nuances of DPPA terms, such as "authorized recipient," obligating the court to premise its analysis on accepting verbatim the bulk requestor's claimed permissible DPPA uses, thus the court is unable to analyze the totality of all events involved in the unauthorized procurement, re-disclosure, resale, purchase, and use of the motor vehicle records. If courts were provided actual proof of the impermissible uses, then some recent rulings in this area would have reached a contrary ruling. Proving actual impermissible DPPA uses though has been the dilemma. This class action though is not premised upon such limitations. All hypothetical distribution "phases" of the Plaintiffs' and Class Members' motor vehicle records were

discovered, revealing an interaction by all Defendants, and culminating in proof of DPPA

violations.

74.     In February 2013, Dallas, Texas NEWS Investigator Mireya Villarreal wrote a

story regarding the sale of Texas Motor Vehicle Records:

http://dfw.cbslocal.com/2013/02/11/cbs-11-investigaes-your-personal-information-for-sale-you-

cant-opt-out/. The story was concerned about the sale of motor vehicle records, inability of

residents to deny access to their motor vehicle records, and noted an interesting detail: "Since

2000, only nine companies have been busted and banned for misusing the DMV data".

CBS 11, "CBS 11 Investigates: State Sells Personal Information & You Can't Opt Out,"
February 11, 2013, (last accessed October 11, 2013), online:
http://dfw.cbslocal.com/2013/02/11/cbs-11-investigates-your-personal-information-for-sale-you-
cant-opt-out/.

75.     Due to issues within the Villareal news story, additional Freedom of Information

Act ("F.O.I.A.") requests were sent to the Texas Department of Motor Vehicles requesting

information pertaining to the entities noted within this story. The response included information

related to Defendant KMB, a company that appeared to be a small one (1) person entity, without

a website or online history, and one that appeared without critical involvement in the extended

auto warranty and VSC Industry. Additional investigation would reveal otherwise.

76.     The F.O.I.A. response provided by the Texas Motor Vehicle Department revealed

that Elizabeth M. Blank, as President of KMB Statistics, LLC, had entered into a Service

Contract for the purchase of Texas Motor Vehicle Title and Registration ("VTR") Database, a

contract made between the State of Texas, acting by and through the Texas Department of

Transportation. The Texas Department of Transportation, Vehicle Titles and Registration (VTR)

Division allows individuals or companies to establish a motor vehicle inquiry account that allows

for remote electronic access, through the Internet via a secure Web site, to VTR records under

certain conditions. The Texas Department of Transportation changed its title to the Texas

Department of Motor Vehicles ("TxDMV") on November 1, 2009, thus all reference to the TxDMV shall include the Texas Department of Transportation, vehicle titles and registration. The KMB contract was dated March 18, 2009 and was terminated by the State on November 30, 2011 due to DPPA violations.

77.     The KMB contract obligated KMB and Blank to abide by the Federal Driver's Privacy Protection Act, State Motor Vehicle Records Disclosure Acts, and the Texas Department of Transportation Service Contract, a contract which emphasized that KMB and Blank must have DPPA permissible uses to obtain motor vehicle records. Such prohibited the obtainment, disclosure, and use of personal information maintained by the Texas Department of Motor Vehicles, unless such information is obtained, disclosed, or used according to specifically enumerated "permissible uses".

78.     Omitted from the Texas Department of Motor Vehicles' F.O.I.A. responses though were documents pertaining to specific reasons for the KMB contract termination. Additional F.O.I.A.'s requests were then required that concentrated on inquiries into areas that apparently impeded an effective response about whether the Texas Department of Motor Vehicle had implemented any compliance procedures. The state's eventual response answered both issues, and opened a "floodgate" of documents incriminating Defendants, individually and collectively, and an entire industry.

79.     The State of Texas Department of Motor Vehicles' response to the F.O.I.A. request revealed that it had implemented a compliance procedure to determine if any person or entity obtaining motor vehicle records were using such for impermissible purposes, a procedure which involved inserting "test records"; hereinafter referred colloquially to as "fake MVRs", a procedure to insert the test records into the weekly files that were provided to any and all bulk requestors of motor vehicle records, essentially to "track" motor vehicle records obtained by

Bulk Requestors, without their notice. Each Bulk Requestor was individually assigned "fake MVRs", which included names, vehicle info, and even "fake" VIN numbers. This assignment of specific fake MVR data would allow a mechanism to confirm improper uses. A valid address was used in order for State Officials to receive any direct marketing and solicitation letters. Upon receipt by a State Official, such letters would be correlated to its original source, thus identifying individuals and companies involved in all hypothetical phases of the motor vehicle records distribution. This compliance "trap" caught all the Defendants in violation of the DPPA, and explained within a F.O.I.A. response by Texas Department of Motor Vehicle Representative, Diane Emrick Dodson:

> "With regards to KMS Statistics, the Division did not perform an audit as described in the contract between the Department and KMB Statistics. To determine whether a vendor is using the information contained in the data from the Registration and Title System database in accordance with the DPPA; the terms of the contract and the permitted use the vendor attests to, the Division randomly inserts test records into the files provided to vendors.
>
> Attached are three solicitations that were made from three separate test records that were included in the data provided to KMB Statistics. These solicitations were are in direct violation of the terms of the contract and resulted in the termination thereof. When the first solicitation was received the contract was immediately terminated. Upon receipt of subsequent solicitations, KMB Statistics was sent a decease and desist letter.
>
> Please contact me, if you have any questions or if additional information is needed.
>
> Diane Emrick-Dodson
>
> TxDMV – Vehicle Titles and Registration Division"

80.    An additional F.O.I.A. response, dated April 29, 2013, provided details of the state's compliance procedure, and explanation of the Defendants' DPPA violations:

> "As we have previously discussed, the Texas Department of Motor Vehicles (TxDMV) – Vehicle Titles and Registration (VTR) takes its responsibility to protect the personal information contained in the Registration and Title System (RTS) database and prevent any misuse

very seriously. As a result of amendments made to the DPPA by the 106th U.S. Congress, the State of Texas acted to insure the privacy of personal information contained in the RTS by "opting out" all motor vehicle owners. This means the TxDMV-VTR does not release personal information from the motor vehicle registration and titling records unless such release is required or permitted by law. The TxDMV-VTR strictly prohibits the use of the personal information for marketing or soliciting motor vehicles owners.

Although there are vendors who purchase motor vehicle records data from the TxDMV, the use of this data is regulated by law and strict contractual guidelines. If a vendor sells or uses the data in violation of the DPPA, their contract is terminated and they are prohibited from purchasing the data in the future. To identify vendors who may be using or selling the data which is then misused, the Division implemented a means to verify potential misuse. Periodically, the Department creates a series of "test records". Each test record or records is/are unique to a single vendor. Typically, a different record is inserted into the weekly file a vendor receives for three to four consecutive weeks. Vendors are not advised of this internal check and balance.

We have provide to you copies of the checks wherein CIS paid for some of the weekly update files on behalf of KMB Statistics. The letter regarding the KMB Statistics contract termination and the subsequent letter to cease and desist from further use of the data that have previously been provided are the only documents regarding the Department's action to terminate the contract and to advise KMS Statistics to stop using/distributing the data purchased from the TxDMV.

The records that were provided to KMB Statistics were FTP'd electronically (file transfer protocol). KMB's physical address is 7120 185th Avenue, NE – Redmond, WA 98052.

Diane Emrick-Dodson
TxDMV – Vehicle Titles and Registration Division."

81. The F.O.I.A. responses revealed that KMB and Blank's contract was terminated due to one (1) or more DPPA violations involving Defendants, individually and in concert, illegally obtaining and using the motor vehicle records for impermissible purposes, re-disclosing and reselling motor vehicle records to unauthorized recipients, using motor vehicle records to directly market and solicit Plaintiffs and Class Members, without their express consent, a business plan exposed by "fake MVR" information being incorporated into direct marketing and solicitation letter then sent to State Officials, as shown by some of the actual letters below. The

name, address, customer ID number, and any additional identifying information which would reveal the tracking data has been redacted, replaced with a black box so as not to provide Defendants the ability to warn, delete, or otherwise know which motor vehicle records are "fake MVRs", or to notify any entities using the "fake MVRs", thus permitting the continuous tracking of unauthorized uses of the motor vehicle records by Defendants and Doe entities, activities that continue to date as evidenced by responses to additional F.O.I.A.'s. The actual marketing and solicitation correspondence used by Defendant EWS, and received by State Officials was as follows:



82.     The most incriminating series of documents produced in response to the Texas Department of Motor Vehicles' F.O.I.A. Requests revealed that Compact Information Systems had made monthly payments from March 2011 until November 2011, on behalf of KMB and Blank to obtain the motor vehicle records directly:



83.     Upon further analysis and information provided within responses to the Texas Department of Motor Vehicles F.O.I.A. Requests, in addition to F.O.I.A. responses provided by other states, the outline of an organized "syndicate" emerged, producing a complex infrastructure of individuals and entities that were acting in violation of the DPPA, and linked to one (1) or more of the Defendants, which were acting as Direct Market providers or "suppliers" to many entities using the motor vehicle records for marketing and solicitation, or "dealers". This information also provided the outline of an industry.

84.     This class action may be the first notice to Defendants Blank, KMB, DSOA, and CIS for the actual reasons for the Texas Department of Motor Vehicles contract termination, since apparently the Texas Department of Motor Vehicles had not alerted these Defendants about the specifics of its DPPA non-compliance. As such, the acts which caused the termination of the

contract, and made the basis of this action, continue to date. Recent state responses to F.O.I.A.'s produced a multitude of additional entities using the motor vehicle records provided to Defendant Blank entities and CIS for direct marketing and solicitation. Based upon information and belief, the motor vehicle records continue to be sold to a multitude of entities, and such entities remain unaware of the monitoring procedures attached to such motor vehicle records.

85.     This class action will probably be the first notice to CIS Affiliates as to the specifics of its DPPA non-compliance. As such, the "fake MVRs" continue to be used by CIS Affiliates and it remains unaware of the monitoring procedures attached to the "fake MVRs".

86.     On information provided, KMB and Blank initially obtained the Texas motor vehicle records directly from March 2009 to February 2011, periods within the class period. Reportedly the motor vehicle records were FTP'd electronically (file transfer protocol) provided to KMB and Blank, and the physical address provided to the State was 5311 SW 9th Place, Cape Coral, Florida 33914. Discovery shall be required to determine if KMB, Blank, and DSOA provided Compact Information Systems, Endurance Warranty Services, or any other entities, the motor vehicle records prior to February 2011.

87.     In the first quarter of 2011 the association and activities between Defendant Blank Entities and Compact Information Systems changed, including but not limited to, the following:

> 1.      Defendant Blank was hired by Compact Information Systems in a capacity as the Vice President of Compact Information Systems Vehicle Division;
>
> 2.      Compact Information Systems acquired Data Solutions of America, Inc., an entity owned by Defendant Blank, omitting the acquisition of KMB Statistics, LLC;
>
> 3.      Compact Information Systems rebranded Data Solutions of America, Inc.'s "National Auto List" as "Compact National Auto List";
>
> 4.      Compact Information Systems registered with the Florida Secretary of State as a foreign profit corporation;

5.    Compact Information Systems registered Defendant Blank as its registered agent in Florida;

6.    KMB and Blank continued obtaining Texas motor vehicle records;

7.    KMB and Blank redirected the flow of Texas motor vehicle records from its office in Florida to the Compact Information Systems office in Washington;

8.    KMB and Blank continued obtaining Florida motor vehicle records. KMB and Blank had entered into a contract with the Florida Department of Highway Safety Motor Vehicles in order to obtain Florida motor vehicle records. The contract referenced as MOV, HSMV-1027-09, existed for the period between May 2009 – May 2012;

9.    KMB and Blank continued directing the flow of Florida motor vehicle records to locations within Texas and Wisconsin, not Florida or Washington, to the following IP addresses:

   • 64.49.219.228= a static Internet Protocol address ("IP"), assigned to a Texas entity, located within the same city as CIS' Texas office; and

   • 66.185.19.9=Wisconsin CyberLynk Network, Inc. (WCNI)

10.   KMB Statistics, LLC and Blank notified Texas Department of Motor Vehicles of its new location: 7120 185th Ave NW, Suite 150, Redmond, Washington 98052, the Compact Information Systems address,

11.   Compact Information Systems began making monthly payments directly to the State of Texas to obtain the motor vehicle records, on behalf of KMB and Blank, from March 2011 to November 2011 until the contract was terminated;

12.   Compact Information Systems controller, Cris Lewis, become the vendor contact person for receipt of the Texas motor vehicle records pertaining to the KMB contract;

13.   KMB and Blank continued to make payments directly to the State of Florida;

14.   Defendant Blank remained as President of Data Solutions of America until it filed for dissolution on September 28, 2012;

15.   Defendant Blank remained as President of KMB until it filed for dissolution on September 27, 2013;

88.   Defendant Blank and KMB did not possess a DPPA permissible use, nor had any

intention to use the motor vehicle records for permitted uses within the DPPA. Defendant Blank had certified three (3) permissible uses, of the fourteen possible "permissible" purposes, on the Texas Department of Transportation service contract. Blank's selections meant it was authorized to obtain, use, and resell motor vehicle information for the following purposes:

1) "B" which corresponds to the "normal course of business", exception, referencing, "to verify the accuracy of personal information submitted by the individual to the business or agent, employee, or contractor of the business";

2) "D" which corresponds to the "research" exception, referencing, "research or in producing statistical reports but only if the personal information is not published, re-disclosed, or used to contact any individual", and

3) "E" which corresponds to the "insurance" exception, referencing, "an insurer or insurance support organization, or by a self-insured entity, or an agent, employee, or contractor of the entity, in connection with claims investigation activities, antifraud activities, rating, or underwriting."

89.     The contract included the following "Certification of Use":

---

**ATTACHMENT A:**

# CERTIFICATION OF USE

*Note:*   *Effective December 1, 2000, the State may release privacy protected personal information contained in motor vehicle records (MVRs), as defined in 18 U.S.C. §2725, only if the Purchaser certifies its intended uses of the information in this Attachment.   Certified intended uses include only those uses for which the Purchaser itself will actually employ the information; certified intended uses do not include uses that are speculative or that will be engaged in by persons acquiring the information from the Purchaser.   If the Purchaser's intended use of the information is not one of the permitted uses, the State will not release the privacy protected personal information.*

---

90.     The DPPA permits states to be more restrictive in its implementation, thus the "Certification of Use" obligated Blank, as the purchaser to have the permissible use "itself", thus not qualifying as a reseller if persons acquiring the motor vehicle records from Blank had a permissible use while Blank didn't possess the permissible use, as noted in the following:

- Certified intended uses include only those uses for which the Purchaser itself will actually employ the information;

- Certified intended uses do not include uses that are speculative or that will be engaged in by persons acquiring the information from the Purchaser.

91.     The DPPA exceptions include two (2) limiting factors: (1) The entities that may claim the exception, and (2) the purpose for which information may be requested.

92.     In order to qualify under the "Normal Business Exception," the request must be from a business that requires verification of personal information submitted by an individual to the business and for the purposes of preventing fraud and pursuing legal remedies or recovering on a debt.  On information and belief KMB did not satisfy such DPPA requirements, nor did any other Defendants. DSOA, CIS, and CIS Affiliates obtained the Plaintiffs' and Class Members' motor vehicle records, directly or indirectly from KMB and Blank. If neither DSOA, CIS, nor CIS Affiliates were eligible to claim the "Normal Business Exception," KMB and Blank's disclosure and subsequent resale would have been for a use not permitted. As such discovery is required to consider (1) whether DSOA, CIS, and CIS Affiliates were eligible to request information pursuant to the Normal Business Exceptions noted by KMB and Blank, (2) if so, whether the activities derived from the exceptions had occurred, (3) if so, whether the activity had occurred. On information and belief, such exceptions did not exist.

93.     In order to qualify under the "Research Exception," the request must be from a business involved in research and statistical reports, "so long as the personal information is not published, re-disclosed, or used to contact individuals". Defendant KMB "statistical" Inc., may claim it operates within this industry, using such identification as a "decoy" to avoid detection by State MVR Departments in order to obtain motor vehicle records, but on information and belief, KMB was involved in the direct marketing industry with the intention to use the motor vehicle records itself, or resell the data to parties involved in the direct marketing industry, such as DSOA, CIS, and direct marketing companies. On information and belief, KMB did not satisfy such DPPA requirements, nor did any other Defendants. DSOA, CIS, and CIS Affiliates obtained the Plaintiffs' and Class Members' motor vehicle records, directly or indirectly from

KMB and Blank. If neither DSOA, CIS, nor CIS Affiliates were eligible to claim the "Research Exception," KMB and Blank's disclosure and subsequent resale would have been for a use not permitted. As such discovery is required to consider (1) whether DSOA, CIS, and CIS Affiliates were eligible to request information pursuant to the Research Exceptions noted by KMB and Blank, (2) if so, whether the activities derived from the exceptions had occurred, (3) if so, whether the activity had occurred. On information and belief, such exceptions did not exist.

94.     In order to qualify under the "Insurance exception," the request must be from either an insurance company, self-insured entity, or entities involved in the insurance industry. On information and belief KMB did not satisfy such DPPA requirements, nor did any other Defendants. DSOA, CIS, and CIS Affiliates obtained the Plaintiffs' and Class Members' motor vehicle records, directly or indirectly from KMB and Blank. If neither DSOA, CIS, nor CIS Affiliates were eligible to claim the "Insurance Exception," KMB and Blank's disclosure and subsequent resale would have been for a use not permitted. As such discovery is required to consider (1) whether DSOA, CIS, and CIS Affiliates were eligible to request information pursuant to the insurance exceptions noted by KMB and Blank, (2) if so, whether the activities derived from the exceptions had occurred, (3) if so, whether the activity had occurred. On information and belief, such exceptions did not exist.

95.     On November 30, 2011, the Texas Department of Motor Vehicles terminated Defendant KMB and Blank's access to motor vehicle records due to violations of the DPPA. As a result of the continued violations of the DPPA, the State sent Defendant Blank a "cease and desist" letter, dated January 31, 2013, referencing activity complained of that was occurring in 2012 and continuing into 2013:

Texas Department of Motor Vehicles

HELPING TEXANS GO. HELPING TEXAS GROW.

January 31, 2013

KMB Statistics, LLC
Elizabeth M. Blank, President
5311 S. W. 9th Place
Cape Coral, FL 33914

RE:  Use of Motor Vehicle Data

Dear Ms. Blank:

On November 30, 2011 the Texas Department of Motor Vehicles notified you that your contract
for motor vehicle data was terminated because our research indicated that you offered this data
for sale to an entity not authorized to receive this data.

We have information that your company continues to offer this data to entities that are not
authorized to receive it.

If you do not immediately cease and desist from this practice, this matter will be referred to the
Office of the Attorney General for the State of Texas upon any reports of noncompliance after
receipt of this letter by your organization.

Sincerely,

Randy Elliston
Director, Vehicle Titles and Registration
Texas Department of Motor Vehicles

cc: John Carney, VTR
    Diane Emrick-Dodson, VTR

U:\KMBSTATC&D.DOC

4000 JACKSON AVENUE, AUSTIN, TEXAS 78731  |  O 512.465.3000 ∗ 888.368.4689 (888-DMVGOTX) ∗ F 512.465.3098  |  www.TxDMV.gov

96.     Defendant Blank's response to the Texas Department of Motor Vehicles' cease

and desist letter, dated February 11, 2013, claimed she was not aware of the DPPA

impermissible uses, and noted a belief that the contract termination was due to her failure to

provide notice to the State that the motor vehicle records were being sent to Compact

Information Systems, omitting reference to CIS Affiliates obtaining the MVR data, acts

reportedly continuing to date. Defendant Blank's response also revealed that CIS was actually

downloading the files for her "insurance clients", providing a representation of CIS' uses, CIS'

contractual involvement with KMB and Blank's insurance associates, omitting the two (2) other

claimed DPPA permissible uses she initially provided to the Texas Department of Motor Vehicle

when she signed the original contract, concluding the correspondence noting KMB had closed,

an act which did not occur until September 27, 2013, and providing a description of KMB

Statistics, LLC, as a "marketing company".

**Carney, John**

| | |
|---|---|
| From: | service@kmbstats.com |
| Sent: | Monday, February 11, 2013 3:07 PM |
| To: | Carney, John |
| Cc: | Elliston, Randy |
| Subject: | Letter dated 1/31/13 to KMB Statistics from TX DMV |

Good Afternoon Mr. Elliston,

I have just been forwarded your letter, it went to a prior registered agents address in error. In your letter you state that you have information that my company offers data to entities that are not authorized to receive it (I am paraphrasing). I am writing to you to let you know that is absolutely not true to my knowledge. I haven't acquired any Texas data since you terminated my agreement in November of 2011 and the only reason we were terminated then was because I changed data centers and neglected to inform you that CIS would now be downloading the files on my behalf and building my files for my insurance clients. I was not told at that time that the information was being distributed by anyone that wasn't authorized to use it. Furthermore, since that time I have actually closed my marketing company and will be closing KMB Statistics, LLC as I have gone back to school for a completely different industry. I do not currently take in any new data from Texas directly or indirectly.

If you would like to provide me with the information I will be happy to investigate the breach if you feel there is one but to my knowledge there is not. In this day and age I suppose anything is possible but we take extreme measures to insure any data we acquire is protected and encrypted and never released in its original form to anyone regardless of their compliance. I take data security very seriously. Again, if you feel there has been a misuse of your file I will absolutely look into that and happily take any action necessary to stop it immediately if I find that your claim is accurate. Please feel free to forward any information you have to me at this email address and I will begin my inquiry.

Thank you so much,

Elizabeth M. Blank
President
KMB Statistics, LLC
239-851-2464

1

97.     The response provided by the Florida Motor Vehicle Department to F.O.I.A.

requests revealed that Elizabeth Blank, as President of KMB Statistics, LLC, 5311 S.W. 9th

Place, Cape Coral, Florida 33914, had entered into a contract in May 2009, referenced as number

HSMV-1027-09, with the Florida Department of Highway Safety and Motor Vehicles in order to

obtain exempt personal information in a motor vehicle/driver's license record. The DPPA

claimed permissible use involved duties provided to an insurance carrier, a use continuing from

2009-2012. The Florida motor vehicle records were sent directly to a location in Texas and Wisconsin, although Defendant Blank entities were located in Florida. A disclosure by Defendant Blank to a Texas DMV representative noted that Defendant CIS, located in Washington, was acting on behalf of Defendant KMB and Blank as to its "Insurance Clients". Such association also apparently not disclosed to the Florida Department of Highway Safety and Motor Vehicles. Such activity occurred during the period when Defendant Blank was Vice President of Compact Information Systems Vehicle Division. Discovery shall be required to produce documents of the claimed DPPA permissible uses, identity of parties in Texas and Wisconsin that obtained the motor vehicle records, and the DPPA permissible uses of the Texas and Wisconsin parties.



**RECEIVED**

MAY 7 2009

**DATA LISTING UNIT**

May 4, 2009

Mr. David Perryman
Florida Dept. of Highway Safety & Motor Vehicles
Data Listing Unit  MS 74
2900 Apalachee Parkway
Tallahassee, FL  32399-0500

Dear Mr. Perryman:

Enclosed are the executed forms for requesting access to Motor Vehicle Records.  We are interested in obtaining "bulk" data of vehicle title changes on a regular basis.  Our client, State Farm Insurance, has contracted to us to perform several duties.  One is to verify the accuracy of their in-house customer file and second, to produce statistical reports showing the percent market coverage they have in the state of Florida per county per zip code.  No personal information will be published.  Just numbers will be provided to them on the reports.

Thank you for your consideration in this matter.

Sincerely,

Elizabeth M. Blank
President

EMB/rgr

Enclosures

5311 SW 9th Place • Cape Coral, Florida 33914 • 239-691-3084

98.     Defendant Blank filed for corporate dissolution of DSOA on September 28, 2012, and KMB on September 27, 2013. KMB continued in operation for twenty-two months after the termination of the Texas Department of Motor Vehicles contract, and sixteen months after the termination of the Florida contract. Discovery shall be required to determine any and all states in which Blank and KMB, or any associated entities, obtained motor vehicle records and the claimed DPPA permissible uses in such states.

### E.  Driver's Privacy Protection Act

99.     With the advancement of information technology in the 1980's a threat to privacy arose from the nonconsensual dissemination of personal information, and Congress sought to regulate particular private sectors. The Video Privacy Protection Act ("VPPA") was enacted to regulate video stores. To protect the privacy and safety of licensed drivers, and to limit misuse of the information contained in these government record systems, Congress enacted the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-2725. The Act imposed strict rules for collecting the personal information in driver records, and provided for liability in cases where an individual or corporation improperly collects, discloses, uses, or sells such records. Congress paid particular attention to differences between motor vehicle records and other public records containing similar information, which it decided not to regulate. One concern that motivated enactment of the DPPA was that personal information in motor vehicle records, including names and addresses, is associated with license plate numbers, which drivers must display to the general public.

> "Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and thus limit their access to personally identifiable information" in other records.

140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); ibid. (statement of Rep. Moran).

100.     Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records. Representative Moran noted in part:

> 1.  In 34 States across the country, there are virtually no restrictions on who has access to the name and address of licensees. In fact, very few Americans realize that by registering their car or obtaining a driver's license through the DMV, they are surrendering their personal and private information to anyone who wants to obtain it. When informed that such information can be so easily obtained, most licensees are shocked and angry. According to a survey released by the National

Association to Protect Individual Rights, 92 percent of Americans believe that the DMV should not sell or release personal data about them without their knowledge and approval.

2. Balancing the interests of public disclosure with an individual's right to privacy is a delicate, but essential, task for government. The Driver Privacy Protection Act (H.R. 3365), which I introduced last week, safeguards the privacy of drivers and vehicle owners by prohibiting the release of personal information--including a person's name and address--to anyone without a specific business-related reason for obtaining the information.

3. H.R. 3365 acknowledges that there are many businesses that depend on access to motor vehicle records to serve their customers, including insurance companies, financial institutions, vehicle dealers, and others. By focusing this legislation on the personal information contained within a driver file, this bill does not limit those legitimate organizations in using the information. It does, however, restrict access to all those without a legitimate purpose.

4. By enacting this legislation, Congress will reaffirm that privacy is not a Democratic or Republican issue, but a basic human right to which every person is entitled.

5. This bill by itself will not stop stalking. But it will stop State government from being an accomplice to the crime.

"LEGISLATION TO PROTECT PRIVACY AND SAFETY OF LICENSED DRIVERS -- H.R. 3365 (Extension of Remarks - November 03, 1993) [Page: E2747]", HON. JAMES P. MORAN in the House of Representatives, WEDNESDAY, NOVEMBER 3, 1993, (last accessed September 27, 2013).

101.    The testimony before Congress also discussed concerns that the personal information contained in state DMV records had considerable commercial value. In particular, the personal information sold by state DMVS were being used extensively at that time to support the direct-marketing efforts of businesses. See 1994 WL 212836 (Feb. 3, 1994) (statement of Richard A. Barton, Direct Marketing Association) ("The names and addresses of vehicle owners, in combination with information about the vehicles they own, are absolutely essential to the marketing efforts of the nation's automotive industry."). Personal information in DMV records "is combined with information from other sources and used to create lists for selective marketing use by businesses, charities, and political candidates." 140 Cong. Rec. H2522 (daily ed. Apr. 20,

1994) (statement of Rep. Moran) ("Marketers use DMV lists to do targeted mailings and other types of marketing.").

102.   Professor Mary Culnan testified that privacy concerns about the use of information "are especially likely to arise when the reuse is not compatible with the original purpose for collecting the information," since in such circumstances "the prospect of misinterpretation or crass exploitation usually follows." 1994 WL 212834 (Feb. 3, 1994) (citation omitted). Professor Culnan further explained:

> DMV information is not collected voluntarily. Few people can survive without a driver[']s license or an automobile, and a condition of having either is to register with the state. By providing this information to marketers without providing an opt-out to its citizens, the state is essentially requiring people to participate in direct marketing absent any compelling public safety argument. This is in direct contrast to most of the other mailing lists based on private sector data, such as a list of subscribers to a particular magazine. The people on these lists have indicated an interest in participating in direct marketing because they have "raised their hands" in the marketplace by voluntarily responding to a commercial offer of some type. No such claim may be made for all licensed drivers and registered automobile owner[s].

103.   Due to the concerns regarding the improper uses of motor vehicle records by the marketing industry, the DPPA was amended in 1999 to change the law to eliminate the practice of selling personal information. Senator Shelby, the principal sponsor, warned against "unrelated secondary uses" of motor vehicle information without prior approval (i.e., for commercial sale in the open market), when the records have been obtained only for the purpose of vehicle registration. Senator Shelby underlined that the purpose of the DPPA was to ensure that individuals must "grant their consent" before the state or a third party can sell or release highly restricted personal information "when it is to be used for the purpose of direct marketing, solicitations, *or individual look-up.*"4 *Hrg. Before the Subcomm. on Transp. of the S. Comm. on Appropriations, 106th Cong.* (2000) (statement of Sen. Shelby, Sponsor), available at 2000 WL 374404.

104.    The "opt out" provisions of the original version of the DPPA was changed to "opt in" provisions in §§ 2721(b)(11) and (12) by the October 1999 amendments to the DPPA. See Pub. L. No. 106-69, 113 Stat. 986 (Oct. 9, 1999). Personal information in motor vehicle records could now be disclosed in certain circumstances for bulk distribution for surveys, marketing, or solicitation, but only if individuals are provided an opportunity, in a clear and conspicuous manner, to block such use of information pertaining to them. 18 U.S.C. 2721(b)(12). Thus, disclosure of motor vehicle information about an individual for direct-marketing purposes is prohibited unless (a) the individual is provided the opportunity, under Section 2721(b)(11), to block general disclosure of their personal information, and declines that opportunity, or (b) the individual is given the opportunity to block use of their personal information for direct marketing specifically, and declines that opportunity.

105.    The DPPA defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name address, telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725(3). "[M]otor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). The DPPA's general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information.

106.    The 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran). The DPPA never explicitly lists any prohibited uses; rather, it generally prohibits all but the

fourteen permissible uses enumerated in section 2721(b). The fourteen permissible uses under the DPPA are:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

(2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original Owner records of motor vehicle manufacturers.

(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only-

(A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

(B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual

(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, re-disclosed, or used to contact individuals.

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

(7) For use in providing notice to the owners of towed or impounded vehicles.

(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety. 18 U.S.C. §2721(b).

107.    Sections 2721(a) and 2722(a) make nondisclosure of personal information the default rule. See 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title."). Section 2721(b) then lists fourteen discrete exceptions to non-disclosure.

108.    According to section 2721(c), "[a]n authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or re-disclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). An authorized recipient under (b)(11) may resell or re-disclose personal information for any purpose. An authorized recipient under section (b)(12) may resell or re-disclose personal information pursuant to subsection (b)(12)." 18 U.S.C. § 2721(c).

109.    Any person who receives personal information from a DMV and resells or further discloses that information must, for five years, maintain records identifying each person or entity

to whom a further resale or re-disclosure was made, and the permitted purpose for such resale or re-disclosure. See 18 U.S.C. 2721(c) (fourth sentence) (1994 & Supp. III 1997).

110.    The DPPA creates a private right of action for "the individual" whose personal information was knowingly obtained, disclosed, or used "for a purpose not permitted" under section 2721(b). 18 U.S.C. § 2724(a). "It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for *any* use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

111.    The DPPA expressly provides for liquidated damages independent of showing actual damages, where all damages are subject to the Court's discretion. The remedy for a violation of the DPPA is unambiguous under the plain terms of the statute. In *Kehoe v. Federal Bank & Trust*, the Eleventh Circuit held, based on the unambiguous language of the DPPA, which actual damages are not necessary in order to recover under the liquidated damages provision of the DPPA. 421 F.3d 1209, 1212 (11th Cir. 2005) (citing *Doe v. Chao,* 540 U.S. 614 (2004)). The DPPA remedies are as follows:

> (b) Remedies.--The court *may* award--
>    (1) Actual damages, but not less than liquidated damages in the
>    amount of $2,500;
>    (2) Punitive damages upon proof of willful or reckless disregard of
>    the law;
>    (3) Reasonable attorneys' fees and other litigation costs reasonably
>    incurred; and
>    (4) Such other preliminary and equitable relief as the court
>    determines to be appropriate.

112.    The Congressional record is clear: the core aims of the DPPA is to prevent the unauthorized obtainment of a citizen's personal information and the statute creates a tangible right to have one's information secure. The violation of that security is a harm that supports standing. "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda v. Texas*, 410 U.S. 614, 617 n.3 (1973); furthermore, "The actual or threatened injury required by Art. III may exist

solely by virtue of statutes creating legal rights, the invasion of which creates standing ….”

*Warth v. Seldin*, 422 U.S. 490, 500 (1975).

> “It boils down to this: we have doors on our homes so that outsiders who
> seek entry must knock and ask our permission to enter. When we want
> such people to come in, we invite them. When we do not want them in,
> they are not permitted to enter. Doors provide us with the means to control
> our interaction with American citizens should have the power to put
> ‘doors’ on all aspects of their private lives and to expect that anyone who
> wants to enter must seek and gain consent. other people.”

Hrg. Before the Subcomm. on Transp. of the S. Comm. On Appropriations, 106th Cong. (2000)
(statement of Sen. Shelby, Sponsor), available at 2000 WL 374404.

### F.  Resellers' Duty to Exercise Reasonable Care as "Gate Keepers"

113.    The legislative history of the DPPA makes clear that it incorporated "the

intentions of the 1974 Privacy Act …. [And also] include[d] the recommendations of the 1977

Privacy Protection Study Commission [("PPSC")] report." The goal was to prohibit disclosure of

"records" collected and maintained by a Government agency, except under permissible

circumstances. See 5 U.S.C. § 552a(b). The PPSC report recommended that third party record

holders be held to the "same standard" as the Government in order to ensure compliance with the

important statutory protections. Personal Privacy in an Information Society: The Report of the

Privacy Protection Study Commission ch. 13 (July 1977).

114.    This literal reading of the DPPA was designed to promote public safety and to

protect individual privacy, construed so as to maximize their deterrent effect – in particular, by

shifting burdens to institutional actors who regularly engage in the targeted conduct or are

otherwise in a position to minimize future violations.

115.    Congress intended the states to be the "gatekeepers" of the motor vehicle records,

limiting the number of people with access to the personal information because the greater the

number of people with access, the greater the risk that personal information will be disseminated

to those who do not have valid uses for the personal information.

116.    Recognizing the threat caused by unfettered access to individuals' Pii obtained from motor vehicle records, and seeking to balance that concern against the legitimate need of certain parties to have access to DMV records, Congress determined that those records should not be disclosed except to those with a legitimate need for them. It embodied that intent in a statutory scheme designed to carefully limit the uses for which such information may be disclosed. 18 U.S.C. § 2721(b). Congress made clear its intent that the burden of ensuring the permissibility of disclosures be borne by data brokers by imposing a record keeping obligation on them to maintain a list of not only the people to whom they disclosed the data, but also for what purpose the disclosure was made. 18 U.S.C. § 2721(c). The liability provisions of the DPPA is to be interpreted as imposing an affirmative obligation on resellers to determine the true purpose of the "authorized recipients".

117.    In each sentence of section 2721(c) Congress linked the term "authorized recipient" to the specific section of 2721(b) that had authorized the release of the information to the recipient. Congress intended that the authorized recipients to be individuals, entities, or their agents, qualified to receive the information by the terms of section 2721(b). Resellers cannot obtain all of the personal information in the database simply by calling themselves resellers. Entities requesting motor vehicle records have to justify their receipt of personal information under the 2721(b) exception is applicable. Defendants were not "Authorized recipients."

118.    The United States Supreme Court analyzed the D.P.P.A.'s use of "authorized recipient" (albeit in dicta) in Reno v. Condon, noting a person must have initially obtained the data for an permissible purpose before resale or dissemination of the data:

> After listing section 2721(b)'s fourteen permissible purposes, Chief Justice Rehnquist equated authorized recipients under section 2721(c) with "private persons who have obtained drivers' personal information for one of the aforementioned permissible purposes to further disclose that information for any one of those purposes." This is also the most logical

conclusion based on the language of the DPPA, the purpose of the statute, the legislative history, and common sense.

(quoting Reno v. Condon, 528 U.S. at 146 (citing 18 U.S.C. §2721(c)).

119.    To ensure that the privacy of driver records is adequately protected under the DPPA, it was necessary to impose a high standard of duty for resellers when the records they sell are subsequently used for impermissible purposes, due in part because an industry of "resellers" had arisen to facilitate acquisition by end-users of information collected by State Motor Vehicle Bureaus. As the reseller is in the best position to determine whether the subsequent use of the data would be permissible under the Act, it is the reseller that must bear the burden of ensuring that an impermissible use does not occur and must investigate to determine if entities requesting the motor vehicle records have a DPPA permissible purpose. The state agency ceases to be the custodian of the data once it is obtained by the reseller; the reseller must therefore assume the responsibility and the liability for the subsequent use of the data resulting from its intentional resale, especially as it relates to direct marketing. The civil remedies provision would be rendered "toothless" if resellers could insulate themselves from liability based solely on conclusory representations of end users, without being required to exercise due care themselves.

120.    The DPPA regulates the activity of resellers when acting as a "middleman", and places civil damage liability on the person and/or company that knowingly obtains, re-discloses, resells, and purchases the motor vehicle records for improper purposes.

121.    In light of the text, structure, and legislative history of the DPPA, resellers are subject to a duty of reasonable care before disclosing DPPA-protected personal information, 18 U.S.C. § 2721(b)-(c). Resellers must exercise reasonable care in responding to requests for personal information drawn from motor vehicle records. Resellers are liable if they do not secure proof that representations made by the recipient of personal information was valid. Defendants failed to exercise such reasonable care when reselling the motor vehicle records.

122.     The structure of the DPPA supports the conclusion that resellers owe a duty of reasonable care when reselling motor vehicle records to third parties. The DPPA statute uses the word "knowingly," revealing that a level of duty of care exists. The DPPA provides an award of "punitive damages upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724(b)(2); In contrast, the court may award "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b) (1). The actual damages provision is silent as to the degree of fault necessary to trigger liability for actual damages. If, however, as the statute suggests, punitive damages are available only for willful and reckless violations of the DPPA, then actual damages must require something less -- that is, conduct that is neither willful nor reckless.

123.     The structure of the DPPA, clearly indicates that the liability of a reseller of motor vehicle records is not predicated on their knowledge of the end user's actual purpose. Rather, it is the same as the end user's. That is because section 2722(a) makes no distinction between the mental state required by the person who obtains motor vehicle records and one who discloses it. Indeed, the statue on its face applies equally to those who "obtain" and those who "disclose" Pii. 18 U.S.C. § 2722(a).

124.     Section 2721(c) does not suggests that a reseller may re-disclose protected information so long as its customer claims to have a permissible use. Rather, the DPPA authorizes the resale of information only if there is an actual, not just a stated, permitted use. 18 U.S.C. § 2721(c); Thus, as a purely textual matter, the DPPA indicates that a reseller who sells protected information to a client without an actual permissible purpose is liable regardless what "certifications" that client has made.

125.     Resellers owe the same or similar legal duty that obligates the State Motor Vehicle Department's when releasing motor vehicle records, that is to investigate fully whether

individuals or companies obtaining the motor vehicle records have a DPPA permissible purpose. As the motor vehicle records are resold, in whole or part, the likelihood of misuse grows exponentially. The DPPA provides no distinction as to obligations of the end-user, resellers, nor the State Motor Vehicle Departments, as Custodian of the motor vehicle records.

126.    All Defendants are involved in, directly or indirectly, the Direct Marketing industry. The DPPA restricts access to motor vehicle records for Direct Marketing unless express consent is obtained. Defendants failed to obtain express consent. Subsection (b)(12) implements an important objective of the DPPA—to restrict disclosure of personal information contained in motor vehicle records to businesses for the purpose of direct marketing and solicitation. Direct marketing and solicitation presented a particular concern not only because these activities are of the ordinary commercial sort but also because contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information. The DPPA was enacted in part to respond to the States' common practice of selling personal information to businesses that used it for marketing and solicitations. Congress chose to protect individual privacy by requiring a state DMV to obtain the license holder's express consent before permitting the disclosure, acquisition, and use of personal information for bulk solicitation.

127.    Defendant Blank Entities and Compact Information Systems acted as resellers, acting as a "source", with an actual legal duty, other than the ministerial task of soliciting rote representations from prospective requestors. Resellers must confirm those obtaining motor vehicle records have a DPPA permissible use to obtain motor vehicle records. This obligation is not met merely by accepting the end user's "say-so" in the presence of red flags suggesting the requested information was being sought for an improper DPPA purpose. A cursory review of CIS Affiliates' company website would reveal its business objectives, and provide "red flags" requiring additional review prior to the release of the Plaintiffs' and Class Members' MVRs.

128.    The prospective requestors, acting as a recipient of the motor vehicle records also have an actual legal duty, other than the ministerial task of soliciting rote representations from prospective resellers. The prospective requesters must confirm that the resellers had a DPPA permissible use to resell motor vehicle records. This obligation is not met merely by accepting the reseller's "say-so" in the presence of red flags suggesting the requested information was obtained for a proper purpose. A cursory review of Blank Entities and Compact Information Systems' website would reveal its business objectives, and provide "red flags" requiring additional review prior to the purchase of the Plaintiffs' and Class Members' MVRs.

129.    To verify the eligibility to invoke the claimed DPPA permissible purpose, an entity must provide information, including but not limited to, proof relating to its business which must correspond to its claimed DPPA uses, current status, activity of the employing entity, and purported business Affiliation. It is negligent if the reseller fails to make proper inquiries of the end-user, especially if "red flags" exist, and provide "red flags" requiring additional review prior to the purchase of the Plaintiffs' and Class Members' MVRs

130.    Defendant Blank created, KMB and DSOA for a reason and with a purpose in mind. KMB was an entity that entered into a contract with State Motor Vehicle Departments to obtain motor vehicle records, while DSOA was a Direct Marketing entity within this ongoing business relationship between KMB and DSOA. Federal, State, and contractual duties existed that obligated KMB to obligate DSOA to use the requested MVR information for purposes permitted by the DPPA. Hence, at a minimum, DSOA's disclosures to KMB were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

131.    KMB and Blank had an ongoing business relationship with CIS through which KMB and Blank knew Compact Information Systems was a Direct Marketer Provider. Compact

Information Systems was required to contractually agree with KMB and Blank that it would only use information for purposes permitted by the DPPA. Hence, at a minimum, Compact Information Systems disclosures to KMB and Blank were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

132.    Blank and DSOA had an ongoing business relationship with CIS through which Blank and DSOA knew CIS was a Direct Marketer Provider. CIS was required to contractually agree with Blank and DSOA that it would only use information for purposes permitted by the DPPA. Hence, at a minimum, CIS disclosures to Blank and DSOA were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

133.    CIS had an ongoing business relationship with CIS Affiliates through which CIS knew CIS Affiliates were a Direct Marketer Providers. CIS Affiliates was required to contractually agree with CIS that it would only use information for purposes permitted by the DPPA. Hence, at a minimum, CIS Affiliates disclosures to CIS were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

134.    Defendant Blank and KMB were legally obligated to require DSOA to certify the intended DPPA uses, and obligate DSOA to maintain documents for five (5) years of any and all individuals and entities that obtained the motor vehicle records. Discovery shall be required to produce such documents.

135.    Defendant Blank and DSOA were legally obligated to require CIS to certify the intended DPPA uses, and obligate CIS to maintain documents for five (5) years of any and all individuals and entities that obtained the motor vehicle records. Discovery shall be required to produce such documents.

136.    Defendant CIS was legally obligated to require CIS Affiliates to certify the intended DPPA uses, and obligate CIS Affiliates to maintain documents for five (5) years of any and all individuals and entities that obtained the motor vehicle records. Discovery shall be required to produce such documents.

137.    Defendant Blank Entities and CIS refused to verify the accuracy of underlying facts, purported business affiliations, declining to confirm inferences of risk that existed that CIS Affiliates did not possess permissible DPPA purposes, actions best construed as deliberate ignorance, or in the alternative, negligent.

138.    Defendant Blank became the custodian of the motor vehicle records with a duty to exercise reasonable care when re-disclosing or reselling motor vehicle records. CIS did not have a contract with the state, and thus knew it had no authority to obtain the state motor vehicle records directly. While the contract with the TxDMV was with KMB, by and through Blank as its legal representative, for all extent and purposes' CIS became the initial recipient of the motor vehicle records transferred from the state. Defendant Blank failed in her duty as gatekeeper, failing to exercise reasonable care by allowing CIS access to the motor vehicle records in such manner. Defendant Blank failed intentionally, or in the alternative, negligently.

139.    Defendant Blank's duty, in her capacity as President of KMB and custodian of the motor vehicle records, had obligations separate from her duties as President of Data Solutions of America and VP of Vehicle Division Department at CIS, all positions reportedly held independently and concurrently, within the class period. Blank was required to strictly abide by the terms of the DPPA and State contract in all capacities, but she failed or in the alternative, negligently.

140.    Defendant Blank's position as President of DSOA obligated her to investigate and determine whether CIS had a DPPA permissible use for the motor vehicle records it sought to

obtain from Blank Entities. Blank knowingly, with willful and wanton disregard, or in the alternative, negligently, failed to provide an investigation of CIS prior to reselling the motor vehicle records. A minimal review by Blank Entities of CIS' business practices would have revealed "red flags", as to its claimed DPPA permissible uses, requiring an additional in depth review.

141.    Defendant Blank's positions placed her in the capacity to merge her duties as recipient of the State motor vehicle records and to determine CIS affiliates qualifications to receive motor vehicle records, in her position of Vice President of the Vehicle Division with CIS.  Blank Entities' duties and liability thereof, merged with CIS duties, and liability thereof, by this association and activity.

142.    Defendant CIS, as requestor of motor vehicle records from Blank Entities was obligated to investigate and determine whether Blank Entities had a DPPA permissible use to possess and resell the motor vehicle records to CIS. CIS knowingly, with willful and wanton disregard, or in the alternative, negligently, failed to provide an investigation of Blank Entities prior to reselling the motor vehicle records. A minimal review by CIS of Blank Entities' business practices would have revealed "red flags", as to its claimed DPPA permissible uses, requiring an additional in depth review, including but not limited to:

a)    The source of origin for DSOA's vehicle auto database, "National Auto List" which would be re-branded as "Compact National Auto Lists".

143.    Defendant CIS, as custodian of the motor vehicle records, was obligated to investigate and determine whether CIS Affiliates had a DPPA permissible use for the motor vehicle records it sought from CIS. CIS knowingly, with willful and wanton disregard, or in the alternative, negligently, failed to provide an investigation of CIS Affiliates prior to reselling the motor vehicle records. A minimal review by Blank Entities and CIS of CIS Affiliates' business

practices would have revealed "red flags", as to its claimed DPPA permissible uses, requiring an additional in depth review, including but not limited to:

a)      Defendant EWS' website referenced it was a Direct Marketing company, an internet search would have revealed a substantial amount of consumer complaints about marketing and solicitation improprieties, involved in an investigation by the Florida Office of Insurance regulation, case no: 99160-08, wherein a cease and desist order was issued relating to the unauthorized business of Motor Vehicle Service Agreements;

144.   A minimal review by the CIS Affiliates, would have revealed "red flags", as to the business practices of Blank Entities and CIS as to its claimed DPPA permissible uses, requiring additional in depth review, including but not limited to:

a)      Defendant Blank Entities were in the Direct Marketing Industry, Defendant Blank had signed a contract with states to obtain motor vehicle records for purposes that did not include Direct Marketing, Defendant Blank was employed with Defendant CIS at the same time she owned and operated KMB, an entity obtaining motor vehicle records, DSOA created and sold a motor vehicle database that included, but was not limited to, motor vehicle records, and should have inquired as to its source.

b)      CIS was a Direct Marketing company that had obtained the motor vehicle records, acquired DSOA, hired Defendant Blank as V.P. of its Vehicle Division while she was also President of KMB and receiving motor vehicle records. CIS purchased and promoted the DSOA motor vehicle list and should have inquired as to its source.

145.   This obligation exists to conduct investigative duties on resellers, using minimal safeguards in a reseller's request process. Such additional burdens in doing so impose the benefit of preventing stalking, harassment, identity theft, and other criminal acts this would be well worth the time and expense of such a burden. Blank, KMB, DSOA, and CIS failed to investigate

the CIS Affiliates, either knowingly or in the alternative carelessly taking basic steps to confirm the truthfulness of the CIS Affiliates' stated purpose, or verifying that the purposes for which they disclose driver's records are in fact permissible under the DPPA. This willful or negligent blindness is not a defense to liability.

### G. Defendants' Harmful Practices

146.     Defendants' activities occurred throughout the United States, obtaining the motor vehicle records of Plaintiffs and the Class Members for purposes not permitted - a course of action, and a body of information, that is protected from access and disclosure by federal law.

147.     Without remedy, Plaintiffs' and Class Members' privacy will continue to be violated by Defendants and a multitude of companies affiliated with Defendants — companies they've never heard of, companies they have no relationship with, and companies they would never choose to trust with their motor vehicle records.

148.     The collection, use, and disclosure of Plaintiffs' and Class Members' motor vehicle records by Defendants implicates Plaintiffs' and Class Members' privacy and physical safety. Such information is afforded special attention due to the consequences for both privacy and physical safety that may flow from its disclosure. The heightened privacy and physical safety concerns generated by obtaining, using, and disclosing such information, without authorization, is apparent in U.S. law, creating restrictive consent standards for its obtainment, use, and disclosure.

149.     Defendants obtained Class Members' motor vehicle records for the purpose of committing a tortious and/or criminal act, and violated the constitutional rights of Plaintiffs and Class Members.

150.     Defendants have, either directly, or by aiding, abetting, and/or conspiring to do so, willfully, knowingly, negligently, or recklessly, disclosed, exploited, misappropriated and/or engaged in widespread commercial usage of Plaintiffs' the Class Members' motor vehicle

records, obtaining personal information for Defendants' own benefit, without legal authorization, and without Plaintiffs' and Class Members' knowledge, authorization, or consent. Such conduct constitutes a highly offensive and dangerous invasion of Plaintiffs' and the Class Members' privacy and safety.

151. Defendants knowingly obtained, disclosed, and/or used Plaintiffs and Class Members personal information, derived from motor vehicle records, for a purpose not permitted legally, a violation of a federal statutory right.

152. At all times material, Defendants, and agents of the Defendants, knew, or reasonably should have known, that their actions violated clearly established statutory rights of the Plaintiffs and the Class members.

153. The individual Defendants knowingly authorized, directed, ratified, approved, acquiesced in, committed or participated in disclosing Plaintiffs' and the Class members' highly restricted personal information.

154. The individual Defendants were aware, or should have been aware, that such a disclosure of Plaintiffs' and the Class members' highly restricted personal information, without the express consent of the person to whom the information pertained was an invasion of privacy in violation of the DPPA.

155. Plaintiffs and Class Members were harmed when Defendants intentionally, or in the alternative, negligently, obtained, processed, disseminated, stored, and used motor vehicle records to market and solicit Plaintiffs' and Class Members', obtained without authorization, and invading their right of privacy.

156. Defendants' conduct caused outrage, mental suffering, and harm to Plaintiffs' and Class Members' privacy and safety expectations.

157. Defendants were not authorized to have free access to Plaintiffs' and Class

Members' motor vehicle records for purposes unrelated to Defendants' claimed D.P.P.A. purpose when initially obtaining the motor vehicle records from the state.

158.     Defendants failed to acquire, independently, and in concert, the express consent, of Plaintiffs and Class Members before obtaining, collecting, generating, deriving, disseminating, storing, or causing to be stored, re-disclosing or purchasing the MVR data of Plaintiffs and Class Members.

159.     The Defendant provided the Plaintiffs' and Class Members' MVR data to third parties in the form in which it is acquired or Defendants changed the form or content of the MVR data in order to avoid detection.

160.     Third parties associated with Defendants that accessed Plaintiffs' and Class Members' motor vehicle records failed to provide notice of any and all of its activities, any and all uses of the motor vehicle records, present location of all motor vehicle records, and the identity of parties that accessed such motor vehicle records.

161.     The Defendants accessed MVR data which included information about children that qualify to obtain a driver's license and/or register a motor vehicle, failing to distinguish personal data about children ages 18 and under from personal data about adults.

162.     The Defendants failed to provide adequate policies, practices, and procedures relating to the re-disclosure and resale to third parties obtaining the Plaintiffs' and Class Members' motor vehicle records.

163.     The Defendants failed to monitor compliance regarding the conditions of use between the Defendants Blank Entities, CIS, and the CIS Affiliates, involving the re-disclosure, resale, and purchase of Plaintiffs' and Class Members' motor vehicle records, failing to enumerate prohibitions and restrictions on access to the motor vehicle records.

164.     Defendant CIS Affiliates used false and misleading advertisements, derived from

the data within Plaintiffs' and Class Members' motor vehicle records, in a marketing and solicitation exploit, sending a deceptive mailer which included false statements advising Plaintiffs and Class Members that their auto warranties had expired, or were about to expire, creating a sense of urgency by claiming the offering period was limited, mailing such in an envelope which appeared to be state official business.

165.    Defendants' activities alleged herein in parts constituted a knowing and intentional scheme to defraud Plaintiffs and the Class Members, and to wrongfully access and retain Plaintiffs' and Class Members' motor vehicle records.

166.    In the course of committing the acts described above, Defendants KMB, Elizabeth Blank, DSOA, and CIS intentionally accessed, on a repetitive basis, and without authorization, government facilities, in order to obtain Plaintiffs' and Class Members' motor vehicle records, intentionally exceeding access authorization, obtaining, and using Plaintiffs' and Class Members' motor vehicle records for impermissible purposes.

167.    Harms and damages to Plaintiffs and the Class Members occurred during the class period set forth in the factual allegations herein and continue to the present, including but not limited to, the costs of lost personal and business time, reviewing correspondence received, investigating how any individual and/or company could have access to their motor vehicle records, contacting their actual auto dealer, vehicle manufacturer, actual warranty dealer and any associated parties in order to review the terms of their extended auto warranty or vehicle service contract, and rectifying the consequences of Defendants' conduct in harvesting Plaintiffs' and Class Members' motor vehicle records.

168.    Further, through its practices, Defendants have been able to raise its profile as possessing motor vehicle records with many companies, enabling Defendants to attract business, increase its prospective revenue, secure investment funding, and thereby profit from its conduct

described herein.

169.     On information and belief, Plaintiffs' and Class Members' motor vehicle records were transmitted between Defendants and other third parties, more than likely through electronic communications, "in the clear" (sometimes referred to as "plain text"): that is, without encryption, thus exposing access by unknown parties. Defendants' transmission of motor vehicle records "in the clear," was substandard in light of reasonably accepted security measures that are well understood to be associated with such poorly secured transmission and exposing each Plaintiff to additional unreasonable risks of the interception of their motor vehicle records. Such unsecured transmissions were particularly inappropriate given the nature of technology through which such information were transmitted.

170.     As with any form of property, Plaintiffs, as the owners, should be compensated for the use and exploitation thereof, and if they are not, they suffer concrete, measurable damage and injury, the exact amount of which shall be provided by Plaintiffs through expert opinion.

171.     The Defendants acquired Plaintiffs' and Class Members' motor vehicle records that were unnecessary to motor vehicle records stated functions, but were useful to the Defendants in their commercial compilation, and use of the data derived from the motor vehicle records. With the motor vehicle records acquired, the Defendants used the information to compile—in addition to the types of information—personal and private information that included consumers' personal characteristics.

172.     The Defendants re-disclosed and resold users' motor vehicle records, and/or purchased and merged Plaintiffs' and Class Members' personal information, with other personal information about the Plaintiffs and Class Members that is available in the commercial and secondary information market which the data mining entities take substantial efforts to shield from the public eye. The Defendants, and Doe Entities, used the merger of personal information

derived from motor vehicle records for commercial benefit.

173.     During the Class Period, each Plaintiff named herein had personal motor vehicle records obtained, used, re-disclosed, stored, resold, and purchased for purposes that included marketing and solicitation, without their express consent. Such data was identifiable as to each of the Plaintiffs and Class Members and were transmitted to third parties for purposes wholly unrelated to its use and functionality when Plaintiffs and Class Members produced such to the state.

## I.      CLASS ALLEGATIONS

174.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek certification of the following classes (collectively, the "Classes"):

(a) NATIONWIDE CLASS: All persons in the United States who, on or after, four (4) years prior to the date of this filed complaint, through the final disposition of this or any related actions (the "Class Period"), had Defendant Elizabeth Blank, KMB Statistics, LLC,  Data Solutions of America, or Compact Information Systems, obtain directly or indirectly, their motor vehicle records from their State Department of Motor Vehicles, to use, re-disclose, and resell, for purposes that included direct marketing and solicitation, without express consent. Some persons within the NATIONWIDE CLASS are also within the ENDURANCE WARRANTY SERVICES SUBCLASS and TEXAS SUBCLASS;

(b) ENDURANCE WARRANTY SERVICES SUBCLASS: All persons who, on or after, four (4) years prior to the date of this filed complaint, through the final deposition of this or any related actions (the "Class Period") had Endurance Warranty Services, obtain directly or indirectly, their motor vehicle records from Defendant Elizabeth Blank, KMB Statistics, LLC, Data Solutions of America, or Compact Information Systems, to use, re-disclose, and resell, for purposes that included direct marketing and solicitation, without express consent. All persons within the ENDURANCE WARRANTY SUBCLASS are also within the NATIONWIDE CLASS and some persons are within the TEXAS SUBCLASS;

(c) TEXAS SUBCLASS: All persons in Texas who, on or after, four (4) years prior to the date of this filed complaint, through the final disposition of this or any related actions (the "Class Period"), had Defendant Elizabeth Blank, KMB Statistics, LLC, Data Solutions of

America, Compact Information Systems, or Endurance Warranty Services, obtain directly or indirectly, their motor vehicle records from the Texas Department of Motor Vehicles, to use, re-disclose, and resell, for purposes that included direct marketing and solicitation, without express consent. Some persons within the NATIONWIDE CLASS, ENDURANCE WARRANTY SERVICES SUBCLASS are also within the TEXAS SUBCLASS.

175.    Excluded from the class are the Defendants, its employees, officers, directors, agent, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which Defendants' exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, in addition to Plaintiffs' legal counsel, employees, and their immediate family, the judicial officers and their immediate family, and associated court staff assigned to this case, and all persons within the third degree of consanguinity, to any such persons.

176.    Plaintiffs reserve the right to revise these definitions of the classes based on facts they learn as litigation progresses.

177.    The Class consists of millions, if not tens of millions, of individuals and other entities, making joinder impractical.

178.    The members of the Class are identifiable from the information and records in the custody of the Defendants identified in the Class definition, and the State Motor Vehicle Department which provided motor vehicle records to Defendant KMB, Blank, and Compact Information Systems.

179.    Defendants' conduct, as complained of herein, is generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

180.     The claims of Plaintiffs are typical of the claims of all other Class Members.

181.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have suffered damages in their own capacity from the practices complained of, in that their personal information or highly restricted personal information has been unlawfully obtained, disclosed, and sold for a profit, and is ready, willing, and able, to serve as Class representatives.

182.     Plaintiffs' have retained counsel with substantial experience in prosecuting complex litigation and class actions involving unlawful commercial practices. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest that might cause them not to vigorously pursue this action.

183.     A class action will cause an orderly and expeditious administration of Class Members' claims and economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured. Individual Class Members are unlikely to be aware of their rights and are not likely to be in a position (either through experience or financially) to commence individual litigation against Defendants.

184.     Absent a class action, most Class Members would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

185.     The Defendant has acted and failed to act on grounds generally applicable to Plaintiffs and all of the other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members.

186.    The factual and legal basis of Defendants' liability to Plaintiffs, and to the other Class Members are the same, resulted in injury to Plaintiffs and all of the other Class Members. Plaintiffs and the other Class Members have all suffered harm and damages as a result of Defendants' wrongful conduct.

187.    Certification of a class under Fed. R. Civ. P. 23 is appropriate because Plaintiffs and the putative Class Members have questions of law and fact that are common to the Class that predominate over any questions affecting only individual members of the Class, and a class action is superior to all other available methods for fair and efficient adjudication of this controversy in fact, the wrongs suffered and remedies sought by Plaintiffs and the other members of the Class are premised upon an unlawful scheme participated in by Defendants.

188.    There are many questions of law and fact common to Plaintiffs and the Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to the following:

a1.    whether Defendant KMB's conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

a2.    whether Defendant KMB's conduct described herein violates the State Motor Vehicle Records Disclosure Acts;

a3.    whether Defendant KMB's conduct described herein has resulted in acts of Breach of Bailment;

a4.    whether Defendant KMB's conduct described herein has resulted in acts of Conversion;

a5.    whether Defendant KMB's conduct described herein has resulted in acts of Invasion of Privacy and Seclusion and Public Disclosure of Private Facts;

a6.    whether Defendant KMB's conduct described herein has resulted in acts of Negligence;

a7.    whether Defendant KMB's conduct described herein has resulted in acts of Trespass to Personal Property / Chattels;

a8.    whether Defendant KMB's conduct described herein has resulted in acts

of Unjust Enrichment

b1.   whether Defendant Blank's conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

b2.   whether Defendant Blank's conduct described herein violates the State Motor Vehicle Records Disclosure Acts;

b3.   whether Defendant Blank's conduct described herein has resulted in acts of Breach of Bailment;

b4.   whether Defendant Blank's conduct described herein has resulted in acts of Conversion;

b5.   whether Defendant Blank's conduct described herein has resulted in acts of Invasion of Privacy and Seclusion, and Public Disclosure of Private Facts;

b6.   whether Defendant Blank's conduct described herein has resulted in acts of Negligence;

b7.   whether Defendant Blank's conduct described herein has resulted in acts of Trespass to Personal Property / Chattels;

b8.   whether Defendant Blank's conduct described herein has resulted in acts of Unjust Enrichment;

c1.   whether Defendant Data Solutions of America's conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

c2.   whether Defendant Data Solutions of America's conduct described herein violates the State Motor Vehicle Records Disclosure Acts;

c3.   whether Defendant Data Solutions of America's conduct described herein has resulted in acts of Breach of Bailment;

c4.   whether Defendant Data Solutions of America's conduct described herein has resulted in acts of Conversion;

c5.   whether Defendant Data Solutions of America's conduct described herein has resulted in acts of Invasion of Privacy and Seclusion and Public Disclosure of Private Facts;

c6.   whether Defendant Data Solutions of America's conduct described herein has resulted in acts of Negligence;

c7.   whether Defendant Data Solutions of America's conduct described herein has resulted in acts of Trespass to Personal Property / Chattels;

c8.   whether Defendant Data Solutions of America's conduct described herein

has resulted in acts of Unjust Enrichment;

d1.     whether Defendant Compact Information System's conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

d2.     whether Defendant Compact Information System's conduct described herein violates the State Motor Vehicle Records Disclosure Acts;

d3.     whether Defendant Compact Information System's conduct described herein has resulted in acts of Breach of Bailment;

d4.     whether Defendant Compact Information System's conduct described herein has resulted in acts of Conversion;

d5.     whether Defendant Compact Information System's conduct described herein has resulted in acts of Invasion of Privacy and Seclusion and Public Disclosure of Private Facts;

d6.     whether Defendant Compact Information System's conduct described herein has resulted in acts of Negligence;

d7.     whether Defendant Compact Information System's conduct described herein has resulted in acts of Trespass to Personal Property / Chattels;

d8.     whether Defendant Compact Information System's conduct described herein has resulted in acts of Unjust Enrichment;

e1.     whether Defendant Endurance Warranty Services' conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

e2.     whether Defendant Endurance Warranty Services' conduct described herein violates the State Motor Vehicle Records Disclosure Acts;

e3.     whether Defendant Endurance Warranty Services' conduct described herein has resulted in acts of Breach of Bailment;

e4.     whether Defendant Endurance Warranty Services' conduct described herein has resulted in acts of Conversion;

e5.     whether Defendant Endurance Warranty Services' conduct described herein has resulted in acts of Invasion of Privacy and Seclusion and Public Disclosure of Private Facts;

e6.     whether Defendant Endurance Warranty Services' conduct described herein has resulted in acts of Negligence;

e7.     whether Defendant Endurance Warranty Services' conduct described herein has resulted in acts of Trespass to Personal Property / Chattels;

e8.     whether Defendant Endurance Warranty Services' conduct described

herein has resulted in acts of Unjust Enrichment;

h.      whether Defendant Blank, as President of KMB Statistics, LLC, and custodian of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Data Solutions of America, prior to, during, and after, re-disclosing, and/or reselling Plaintiffs' and Class Members' motor vehicle records to Data Solutions of America, by permitting procurement, use, re-disclosure and resale of the Plaintiffs' and Class Members' motor vehicle records by Data Solutions of America, Inc., if so, whether Blank failed in this obligation;

i.      whether Defendant Blank, as President of KMB Statistics, LLC, President of Data Solutions of America, Inc., and custodian of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Compact Information Systems, prior to, during, and after, re-disclosing, and/or reselling Plaintiffs' and Class Members' motor vehicle records, if so, whether Blank failed in this obligation;

j.      whether Defendant Blank, as Vice President of the Vehicle Division at Compact Information Systems, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Compact Information Systems, prior to, during, and after, re-disclosing, and/or reselling Plaintiffs' and Class Members' motor vehicle records, if so, whether Blank failed in this obligation;

k.      whether Defendant Blank, as President of KMB Statistics, LLC, President of Data Solutions of America, Inc., and custodian of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Endurance Warranty Services, prior to, during, and after, re-disclosing, and/or reselling Plaintiffs' and Class Members' motor vehicle records, if so, whether Blank failed in this obligation;

l.      whether Defendant Blank, as Vice President of the Vehicle Division at Compact Information Systems, and custodian of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Endurance Warranty Services, prior to, during, and after, re-disclosing, and/or reselling Plaintiffs' and Class Members' motor vehicle records, if so, whether Blank failed in this obligation;

m.      whether Defendant Compact Information Systems, as custodian of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Endurance Warranty Services, prior to, during, and after, re-disclosing, and/or reselling Plaintiffs' and Class Members' motor vehicle records, if so, whether Compact Information

Systems failed in this obligation;

n.    whether Defendant Compact Information Systems, as requestor of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Data Solutions of America, Inc., Blank, and KMB Statistics, LLC, individually and collectively, prior to, during, and after, receiving Plaintiffs' and Class Members' motor vehicle records, if so, whether Compact Information Systems failed in this obligation;

o.    whether Defendant Endurance Warranty Services, as requestor of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Compact Information Systems, Data Solutions of America, Inc., Blank, and KMB Statistics, LLC, individually and collectively, prior to, during, and after, receiving Plaintiffs' and Class Members' motor vehicle records, if so, whether Endurance Warranty Services failed in this obligation;

p.    The nature and extent of Plaintiffs' and Class Members' actual damages;

q.    The nature and extent of all statutory penalties or damages for which Defendant Compact Information Systems, Data Solutions of America, Inc., Blank, Endurance Warranty Services, KMB Statistics, LLC, are individually liable to Plaintiffs and Class Members; and

r.    Whether punitive damages are appropriate.

189.    The questions of law and fact common to Class Members predominate over any questions affecting only individual members; and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
### Violations of the Driver's Privacy Protection Act, § 18 U.S.C. § 2721 et seq.:
### On Behalf of All Classes, and against All Defendants

190.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

191.    As set forth herein, Defendants violated the Driver's Privacy Protection Act, 18 U.S.C. § 2721, by engaging in the acts alleged in this complaint.

192.    The Driver's Privacy Protection Act, 18 U.S.C. §2721 (a) et seq., regulates obtaining and disclosing personal information gathered by State Departments of Motor Vehicles, making it unlawful for a person or organization from knowingly obtaining or disclosing personal information, or highly restricted personal information contained in motor vehicle records for any purpose not specifically enumerated under §2721(b).

193.    Accordingly, Defendants violated 18 U.S.C. §2721 et seq. by intentionally obtaining, using, re-disclosing, and reselling Plaintiffs' and Class Members' motor vehicle records without knowledge, consent, or authorization, for purposes not specifically enumerated with the act.

194.    Plaintiffs and Class Members are "person[s] referencing" "an individual, organization, or entity, but does not include a State or agency thereof", within the meaning of 18 U.S.C. §2725(2).

195.    18 U.S.C. § 2724(a) prohibits the release and disclosure of personal information, as defined in 18 U.S.C. § 2725(3) about an individual obtained by the State Motor Vehicle Department except as provided in subsection (b), permissible uses, regulates the prohibition on release and use of certain personal information from State motor vehicle records.

196.    18 U.S.C. §2725(3) "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information; but does not include information on vehicular accidents, driving violations, and driver's status.

197.    The contents of the records obtained by Defendants pertaining to the Plaintiffs and Class Members constitute a "motor vehicle record", referencing "any record that pertains to

a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles", within the meaning of 18 U.S.C. §2725(1).

198.    18 U.S.C. § 2722(b), prohibits any organization or entity from making any false representation to obtain any personal information or highly restricted personal information from an individual's motor vehicle record.

199.    Defendants violated 18 U.S.C. §2721 (b), individually, and in concert, by making false representations to knowingly obtain the Plaintiffs' and Class Members' motor vehicle records, directly or indirectly, for Direct Marketing purposes, knowingly, or in the alternative, providing for use in marketing and solicitation Plaintiffs and Class Members, without their express consent.

200.    18 U.S.C. §2725(5) "express consent" means consent in writing, including consent conveyed electronically that bears an electronic signature as defined in section 106(5) of Public Law 106–229.

201.    18 U.S.C. § 2721(c), permits an "authorized recipient" of personal information (except for some exceptions) to resell or re-disclose the information, but only for a use permitted under 18 U.S.C. § 2721(b). Defendant Blank and KMB were not authorized recipients, thereby violating 18 U.S.C. § 2721(c).

202.    Defendant Blank and KMB violated 18 U.S.C. § 2721(c) by re-disclosing or reselling Plaintiffs' and Class Members' information to Data Solutions of America, a non-authorized recipient:

203.    Defendant Blank and Data Solutions of America violated 18 U.S.C. § 2721(c) by re-disclosing or reselling Plaintiffs' and Class Members' information to Compact Information Systems, a non-authorized recipient.

204.    Defendant Compact Information Systems violated 18 U.S.C. § 2721(c) by re-disclosing, or reselling Plaintiffs' and Class Members' information to CIS Affiliates, a non-authorized recipient.

205.    Defendants Blank, KMB, DSOA, and CIS are liable directly and/or vicariously for re-disclosure and resale to CIS Affiliates, failing to use reasonable care to investigate CIS Affiliate's claimed DPPA permissible uses when re-disclosing and reselling Plaintiffs' and Class Members' motor vehicle records to the CIS Affiliates.

206.    DPPA, 18 U.S.C. § 2722(b)(12), prohibits the use of motor vehicle records for bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

207.    Defendant CIS Affiliates violated 18 U.S.C. § 2722(b)(12) by obtaining, using, re-disclosing, reselling, and purchasing the motor vehicle records for purposes that include marketing or solicitation, without express consent of Plaintiffs. Defendant Blank, KMB, Data Solutions of America, and Compact Information Systems permitted such access, intentionally, and on occasions, negligently.

208.    Plaintiffs and the putative Class Members have suffered damages, as alleged herein, and pursuant to 18 U.S.C. § 2724(b)(1), are entitled to actual damages, but not less than liquidated damages in the amount of $2,500 each.

209.    Plaintiffs and the Class, pursuant to 18 U.S.C. § 2724(b)(1), are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of money, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations. Unless restrained and enjoined, Defendants will continue to commit such acts. Plaintiffs remedy at law is not adequate to compensate him for these inflicted

and threatened injuries, entitling Plaintiffs to remedies including injunctive relief as provided by 18 U.S.C. § 2724(b)(1).

210.   As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiffs, and each of them, have been caused to sustain harm.

211.   All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.

212.   Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

## COUNT II
### Violations of the State Motor Vehicle Records Disclosure Acts
### On Behalf of All Classes, and against All Defendants

213.   Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

214.   As set forth herein, Defendants violated State Motor Vehicle Records Disclosure Acts by engaging in the acts alleged in this complaint.

215.   State Motor Vehicle Records Disclosure Acts are the implementation of the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721 which regulates obtaining and disclosing personal information gathered by State Departments of Motor Vehicles, making it unlawful for a person or organization from knowingly obtaining or disclosing personal information or highly restricted personal information contained in motor vehicle records for any purpose not specifically enumerated under §2721(b).

216.   Accordingly, Defendants violated State Motor Vehicle Records Disclosure Acts by intentionally obtaining, re-disclosing, using, reselling, and purchasing Plaintiffs' and Class Members' motor vehicle records without knowledge, consent, or authorization, for purposes not specifically enumerated within the act.

217.   Defendants conducted business in multiple states. Pending discovery related to

which states Defendants Blank Entities and CIS obtained motor vehicle records from, and the states Defendant Endurance Warranty Services conducted business in, the State Motor Vehicle Disclosure Acts of Plaintiffs and Class Members within their respective states were violated, violating one (1) of the following "State DPPA's":

> Alabama public law 103-322; Alaska §28.10.505; Arizona §28-447, 28-447,28-450; Arkansas § 27-50-901; California §1808.21; Colorado §42-1-206; Connecticut §14-10; Delaware Title 21 section 305; Florida §119.07(3); Georgia §40-2-130 , §40-3-23; Hawaii §286-172; Idaho §49-202,49-203; Illinois §2-123; Indiana §9-13-3.5-1-15; Iowa §321.11; Kansas §74-2012.74-2022, 45-219; Kentucky §61,874; Louisiana enumerated U.S. Code Title 18 §2721-2725; Maine §29-A, 256, 153; Maryland §12-111-13; Massachusetts MGL Chap 6 §183; Michigan M.C.L.A. §257.208c(3)(4); Minnesota §171.12, 170.23; Mississippi §25-61-5; Missouri Title 12 CSR 10-42.050; Montana §61-11-501; Nebraska 60-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; Nevada §481.063; New Hampshire Chapter 242,RSA 260:14; New Jersey §39:2-3.3; New Mexico §66-1-4.14-66-2-14; New York, NY Vehicle and Traffic law §201,202,313, 354; North Carolina , NCGS 20-43.1; North Dakota §39-06032(6),39-06.1-10; Ohio §149.43, 4501.15,4501.27 and 4507.53; Oklahoma Title 51, §24A.3; Oregon §802.175-802.191; Pennsylvania Title 67 § 75 and Title 75 § 6114; Rhode Island Section 1. Chapter 27-49; South Carolina adopting §56-3-510, without DPPA federal exceptions specifically enumerated by statute; South Dakota , SDCL 32-5-144-32-1-151; Tennessee , TCA 39-14-602; Texas, Texas Transportation Code chapter 70 &731; Utah ,UCA 53-3-104 &53-3-109; Vermont ,23 VSA Chapter 3 and ! VSA Chapter 5, subchapter 3; Virginia §46.2-322; Washington RCW 46.12.380 & 46.52.130. WAC 308-10-050; West Virginia §17A-2A-1 et seq; Wisconsin , WI S.19.36 §341.17, adopting Federal Title 18 USC §2712-2725; Wyoming , adopting Federal Title 18 USC §2712-2725.

218.    State Motor Vehicle Records Disclosure Acts prohibit the release and disclosure of personal information, as defined within each State's Motor Vehicle Records Disclosure Act related to personal information about an individual obtained by the State Motor Vehicle Department, except as provided in permissible use regulates the prohibition on release and use of certain personal information from state motor vehicle records.

219.    The contents of the records obtained by Defendants pertaining to the Plaintiffs and Class Members constitute a "motor vehicle record", referencing "any record that pertains to

a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles", within the meaning of State Motor Vehicle Records Disclosure Acts.

220.    Plaintiffs and Class Members are "person[s] referencing" "an individual, organization, or entity, but does not include a State or agency thereof", within the meaning of Motor Vehicle Records Disclosure Acts.

221.    State Motor Vehicle Records Disclosure Acts "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information; but does not include information on vehicular accidents, driving violations, and driver's status.

222.    State Motor Vehicle Records Disclosure Acts, prohibit any organization or entity from making any false representation to obtain any personal information or highly restricted personal information from an individual's motor vehicle record.

223.    Defendants violated State Motor Vehicle Records Disclosure Acts, individually, and in concert, by knowingly obtaining the Plaintiffs' and Class Members' motor vehicle records to use directly or indirectly, as Direct Marketing databases, knowingly, or in the alternative, providing such to CIS Affiliates that were soliciting and marketing Plaintiffs and Class Members, without express consent.

224.    Defendant KMB, Blank, Data Solutions of America, and CIS failed to use reasonable care to investigate CIS Affiliate's claimed DPPA permissible uses when disclosing and reselling Plaintiffs' and putative Class Members' motor vehicle records to the CIS Affiliates.

225.    State Motor Vehicle Records Disclosure Acts, prohibits use of the motor vehicle records for bulk distribution for surveys, marketing, or solicitations unless the State has obtained

the express consent of the person to whom such personal information pertains.

226.    Defendants are liable directly and/or vicariously for this cause of action. Plaintiffs and the Class therefore seek remedies as provided for by their respective State Motor Vehicle Records Disclosure Act, including such preliminary and other equitable or declaratory relief as may be appropriate, damages to be proven at trial, punitive damages to be proven at trial, and a reasonable attorney's fee and other litigation costs reasonably incurred.

227.    Plaintiffs and the putative Class Members have suffered damages, as alleged herein, and pursuant to their respective State Motor Vehicle Records Disclosure Act, are entitled to actual damages, but not less than liquidated damages.

228.    Plaintiffs and the Class, pursuant to their respective State Motor Vehicle Records Disclosure Acts, are entitled to preliminary, equitable, and declaratory relief; in addition to statutory damages of the greater of money, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations. Unless restrained and enjoined, Defendants will continue to commit such acts. Plaintiffs remedy at law is not adequate to compensate him for these inflicted and threatened injuries, entitling Plaintiffs to remedies including injunctive relief.

229.    As a direct and proximate result of the aforesaid acts and activities of Defendant, Plaintiffs, and each of them, have been caused to sustain harm.

230.    All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.

231.    Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

### COUNT III
### Violations of Common Law by Breach of Bailment:
### On Behalf of All Classes, and Against All Defendants

232.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged

herein.

233.   As set forth herein, Defendants violated the Common Law by Breach of Bailment of Plaintiffs and Class Members by engaging in the acts alleged in this complaint.

234.   The Common Law prohibits damage to property held in Bailment. A Bailment arises where possession, but not ownership, of property is transferred from one party ("Bailor") to another ("Bailee"). Where a Bailee has received a bailment from a Bailor, a duty of care is owed. Typically, a Bailee is strictly liable for the bailment.

235.   Accordingly, Defendants failed its duty to exercise reasonable care to safeguard and protect Plaintiffs' and Class Members' motor vehicle records.

236.   Plaintiffs' and Class Members' delivered Personal Identifying Information and motor vehicle information to the State Motor Vehicle Department when registering their vehicle.

237.   Defendants, acting in deception, concealed its purpose to access Plaintiffs' and Class Members' motor vehicle records from the state, accepting such for impermissible purposes which violated the DPPA, for purposes which include marketing and solicitation Plaintiffs' and Class Members', without express consent.

238.   Defendants owed a legal duty, pursuant to the Driver's Privacy Protection Act, 18 U.S.C. §2721, State Motor Vehicle Records Disclosure Acts, and the contract with the state, creating a fiduciary duty as custodian of the Plaintiffs' and Class Members' motor vehicle records, when it took actual possession of, or control over, Plaintiffs' and Class Members' motor vehicle records.

239.   Defendants accepted consideration, by Plaintiffs' and Class Members; exchange of value when they relinquished the immediate right to control or possess the property inherent with the personal identifying information and motor vehicle information contained in Plaintiffs' and Class Members' motor vehicle records.

240.   Defendants used the bailment for purposes which violated the Driver's Privacy

Protection Act, 18 U.S.C. §2721, thus terminating the bailment, re-disclosing and/or reselling the bailment and failing to return the property in the state it existed prior to the bailment.

241.    As a direct and proximate result of the aforesaid acts and activities of Defendant, Plaintiffs, and each of them, have been caused to sustain harm.

242.    All of the acts and activities of Defendant, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.

243.    Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

**COUNT IV**
**Violations of Common Law by Conversion:**
**On Behalf of All Classes, and Against All Defendants**

244.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

245.    As set forth herein, Defendants violated the Common Law by Conversion of Plaintiffs and Class Members by engaging in the acts alleged in this complaint.

246.    The common law prohibits the intentional intermeddling with personal property, such as motor vehicle records, in the possession of another, which results in the deprivation of the use of the personal property or impairment of the condition, quality, or usefulness of the personal property.

247.    Accordingly, Defendants unlawfully exercised dominion over Plaintiffs' and Class Members' motor vehicle records and thereby converted this property, by obtaining, using, re-disclosing, reselling, and purchasing personal identifying information contained with the motor vehicle records.

248.    By engaging in the acts alleged in this complaint, without the authorization or consent of Plaintiffs and Class Members, Defendants dispossessed Plaintiffs and Class Members from use and/or access to their motor vehicle records, or parts of them. Further, these acts

impaired the use, value, and quality of Plaintiffs' and Class Members' motor vehicle records. Defendants' acts constituted an intentional interference with the use and enjoyment of the motor vehicle records. By the acts described above, Defendants have repeatedly and persistently engaged in trespass to personal property in violation of the common law.

249.    Without Plaintiffs' and Class Members' express consent, Defendants knowingly and intentionally accessed Plaintiffs' and Class Members' property, thereby intermeddling with Plaintiffs' and Class Members' right to possession of the property, and causing injury to Plaintiffs and the members of the Class.

250.    Defendants engaged in deception and concealment in order to gain access to Plaintiffs' and Class Members' motor vehicle records.

251.    Defendants' trespass to chattels, nuisance, interference, unauthorized access of and intermeddling with Plaintiffs' and Class Members' property, caused injury and impairment in the condition and value of Class Members' motor vehicle records.

252.    As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiffs, and each of them, have been caused to sustain harm.

253.    All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.

254.    Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

**COUNT V**
**Violations of Common Law by**
**Invasion of Privacy and Seclusion and Public Disclosure of Private Facts:**
**On Behalf of All Classes, and Against All Defendants**

255.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein.

256.     As set forth herein, Defendants violated the Common Law by Invasion of Privacy and Seclusion and Public Disclosure of Private Facts of Plaintiffs and Class Members by engaging in the acts alleged in this complaint.

257.     The Common Law prohibits the invasion of privacy tort of public disclosure of private facts, the elements are (1) public disclosure, (2) of a private fact, (3) which would be offensive and objectionable to the reasonable person, and (4) which is not of legitimate public concern. The elements of the invasion of privacy tort of intrusion into seclusion are (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person.

258.     Accordingly, Defendants violated the Common Law by Invasion of Privacy and Seclusion and Public Disclosure of Private Facts, due to the taking, and public disclosure of Personal Identifying Information contained within Plaintiffs' and Class Members' motor vehicle records.

259.     The private affairs of the Plaintiff and Class Member include the contents of their motor vehicle records. This information is especially private because it reveals an individual's name, address, and their motor vehicle information, which should not be publicly disclosed such information that reasonable people ordinarily understand to be private, especially when stored with State Motor Departments.

260.     Defendants' actions relating to Plaintiffs' and Class Members' motor vehicle records were in violation of the Driver's Privacy Protection Act, 18 U.S.C. §2721 and in flagrant contravention of contractual State obligations, resulted in the taking and the public disclosure of such private information, as well as in intrusion into their private matters.

261.     Plaintiffs' and the Class Members' motor vehicle records are not a matter of legitimate public concern. Therefore, publicizing, disseminating, exposing or surreptitiously

obtaining Plaintiffs' and Class Members' private motor vehicle records is, and will continue to be regarded as, highly offensive and objectionable to reasonable people, especially where, as here, the commission of a crime (i.e., the illegal and obtainment, use, re-disclosure, and resale of motor vehicle records.

262.    Plaintiff and the Class Members were, and continue to be, damaged as a direct and/or proximate result of Defendants' invasion of their privacy by the public disclosure of their private facts- the contents of their private motor vehicle records. Plaintiff and the Class members are entitled to recover actual and nominal damages. Such damages include expenses for securing their motor vehicle records from another similar invasion of privacy, costs associated with re-securing the data, and procuring and verifying the removal, deletion and scrubbing of the MVR data and data points from the Defendants' records, computers and systems, out of pocket expenses, and other economic and non- economic harm, for which they are entitled to compensation.

263.    Defendants' wrongful actions constitute invasions of Plaintiffs' and Class Members' privacy by disturbing their seclusion and publicly disclosing their private facts contained in their motor vehicle records. As a direct and proximate result, Plaintiff and the Class Members were harmed and suffered damages.

264.    As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiffs, and each of them, have been caused to sustain harm.

265.    All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.

266.    Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

**COUNT VI**
**Violations of Common Law by Negligence:**
**On Behalf of All Classes, and Against All Defendants**

267. Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

268. As set forth herein, Defendants violated the Common Law of Negligence of Plaintiffs and Class Members by engaging in the acts alleged in this complaint.

269. The Common Law prohibits acts, or omission to act wherein parties owe a duty, breached that duty by failing to conform to the required standard of conduct, the negligent conduct was the cause of harm to the Plaintiff, and the Plaintiff was in fact, harmed, or damaged.

270. Accordingly, Defendants violated the Common Law by Negligence, due to acts or omission to act, by obtaining, re-disclosing, using, and reselling Plaintiffs' and Class Members' motor vehicle records, without knowledge, consent, or authorization.

271. Defendants came into possession of Plaintiffs' and Class Members' motor vehicle records and had a duty to exercise reasonable care in safeguarding and protecting such data.

272. Defendants owed a duty of care to Plaintiff and Class Members.

273. Defendants failed to exercise reasonable care in safeguarding and protecting the motor vehicle records of Plaintiff and Class Members.

274. Defendants breached such duty by negligently obtaining, using, re-disclosing, and reselling, Plaintiffs' and Class Members' motor vehicle records.

275. Defendants failed to fulfill its duty to Plaintiff and Class Members, failing to fulfill even the minimum duty of care to protect Plaintiffs' and Class Members' personal information, privacy, and security.

276. Defendants breached their duty by negligently obtaining, using, re-disclosing, and reselling Plaintiffs' and Class Members' motor vehicle records, without any notice or authorization of its purposes, so that Defendants could use such to market and solicit to Plaintiffs' and Class Members', without their express consent.

277. Defendants KMB and Blank also negligently re-disclosed and/or resold Plaintiffs'

and Class Members' motor vehicle records to Defendant Data Solutions of America without exercising reasonable care to examine and investigate its claimed DPPA permissible uses, failing to fulfill even the minimum duty of care to safeguard and protect Plaintiffs' and Class Members' motor vehicle records.

278.   Defendants Blank Entities also negligently re-disclosed and/or resold Plaintiffs' and Class Members' motor vehicle records to Defendant CIS without exercising reasonable care to examine and investigate its claimed DPPA permissible uses, failing to fulfill even the minimum duty of care to safeguard and protect Plaintiffs' and Class Members' motor vehicle records.

279.   Defendant Compact Information Systems also negligently re-disclosed and/or resold Plaintiffs' and Class Members' motor vehicle records to Defendant CIS Affiliates without exercising reasonable care to examine and investigate its claimed Driver's Privacy Protection Act permissible uses, failing to fulfill even the minimum duty of care to safeguard and protect Plaintiffs' and Class Members' motor vehicle records.

280.   Defendants Blank, as Vice President of the Vehicle Division at Compact Information Systems, also negligently re-disclosed and/or resold Plaintiffs' and Class Members' motor vehicle records to Defendant Endurance Warranty Services without exercising reasonable care to examine and investigate its claimed DPPA permissible uses, failing to fulfill even the minimum duty of care to safeguard and protect Plaintiffs' and Class Members' motor vehicle records.

281.   As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiffs, and each of them, have been caused to sustain harm.

282.   All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion,

negligently.

283.    Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

**COUNT VII**
**Violations of Common Law by Trespass to Personal Property / Chattels:**
**On Behalf of All Classes, and Against All Defendants**

284.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

285.    As set forth herein, Defendants violated the Common Law by Trespass to Personal Property / Chattels of Plaintiffs and Class Members by engaging in the acts alleged in this complaint.

286.    The Common Law prohibits the intentional intermeddling with personal property, including motor vehicle records in possession of another, which results in the deprivation of the use of the personal property or impairment of the condition, quality, usefulness, or privacy of the personal property.

287.    Accordingly, Defendants violated the Common Law by Trespassing to Personal Property / Chattels, due to acts or omission to act, by obtaining, re-disclosing, using, and reselling Plaintiffs' and Class Members' motor vehicle records, without knowledge, consent, or authorization.

288.    By engaging in the acts alleged in this complaint, without the authorization or consent of Plaintiffs and Class Members, Defendants dispossessed Plaintiffs and Class Members from use and/or access to their motor vehicle records, or parts of them. Further, these acts impaired the use, value, and quality of Plaintiffs' and Class Members' motor vehicle records. Defendants' acts constituted an intentional interference with the use and enjoyment of the motor vehicle records. By the acts described above, Defendants has repeatedly and persistently engaged in trespass to personal property in violation of the common law.

289.    Without Plaintiffs' and Class Members' consent, or in excess of any consent

given, Defendants knowingly and intentionally accessed Plaintiffs' and Class Members' property, thereby intermeddling with Plaintiffs' and Class Members' right to possession of the property, and causing injury to Plaintiffs and the members of the Class.

290.   Defendants engaged in deception and concealment in order to gain access to Plaintiffs' and Class Members' motor vehicle records.

291.   Defendants' trespass to chattels, nuisance, interference, unauthorized access of and intermeddling with Plaintiffs' and Class Members' property, caused injury and impairment in the condition and value of Class Members' motor vehicle records.

292.   As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiffs, and each of them, have been caused to sustain harm.

293.   All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.

294.   Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

### COUNT VIII
**Violations of Common Law by Unjust Enrichment:**
**On Behalf of All Classes, and Against All Defendants**

295.   Plaintiffs incorporate by reference, and re-allege all paragraphs previously alleged herein.

296.   As set forth herein, Defendants violated the Common Law by Unjust Enrichment of Plaintiffs and Class Members by engaging in the acts alleged in this complaint.

297.   The Common Law prohibits that benefits be unlawfully obtained to the detriment of others, and requires three (3) conditions be met to force reimbursement, compensation, or unjust enrichment: (1) an actual enrichment or benefit to the Defendant, (2) a corresponding deprivation to the Plaintiff, and (3) the absence of a legal reason for the Defendants' enrichment.

298.    Accordingly, Defendants unlawfully obtained or acquired, and then disclosed or sold, personal information or highly restricted personal information derived from motor vehicle records pertaining to Plaintiff and Class Members:

Defendants has been unjustly enriched in that it received and retained the benefits of the proceeds from the sale of personal information or highly restricted personal information derived from motor vehicle records, that it would not have received but for its misconduct as alleged herein;

Said benefits were unlawfully obtained to the detriment of Plaintiff and Class members, whose personal information or highly restricted personal information derived from motor vehicle records is of value to them as personal property which they desired to remain private;

Allowing Defendants to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience.

299.    Plaintiffs and Class Members are entitled to and hereby seek disgorgement and restitution of the benefits obtained by Defendants through its unlawful conduct.

300.    As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiffs, and each of them, have been caused to sustain harm.

301.    All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.

302.    Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully prays for judgment against Defendants as follows:

a) For an order certifying that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(1)(a), (b)(2), and (b)(3);

b)  For an order designating Plaintiffs and their counsel as representatives of the Class;

c)  For a declaration that Defendants' actions violated the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class;

d)  For a declaration that Defendants' actions violated the State Motor Vehicle Records Disclosure Acts, within each Plaintiffs' and Class Members' respective state, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violations of the State Motor Vehicle Records Disclosure Acts, for each Plaintiff and each member of the Class;

e)  For a declaration that Defendants' actions resulted in Breach of Bailment, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violation of Conversion, for each Plaintiff and each member of the Class;

f)  For a declaration that Defendants' actions resulted in Conversion, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violation of Conversion, for each Plaintiff and each member of the Class;

g)  For a declaration that Defendants' actions resulted in Invasion of Privacy and Seclusion and Public Disclosure of Private Facts, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violation of Conversion, for each Plaintiff and each member of the Class;

h)  For a declaration that Defendants' actions resulted in Negligence, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violation of Conversion, for each Plaintiff and each member of the Class;

i)  For a declaration that Defendants' actions resulted in Trespass to Personal Property / Chattels, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' Trespassing to Personal Property / Chattels, for each Plaintiff and each member of the Class;

j)  For a declaration that Defendants' actions resulted in Unjust Enrichment, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' resulted in Unjustly Enrichment, for each Plaintiff and each member of the Class;

k)  As applicable to the Class mutatis mutandis, awarding injunctive and equitable relief including, inter alia: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members motor vehicle records, or to whomever the Court deems appropriate; (iii) requiring Defendants to delete all motor vehicle

records collected through the acts alleged above; (iv) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and (v) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

l) For a preliminary and permanent injunction restraining Defendants, its officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from:

    1) Obtaining, directly or indirectly, Plaintiffs' and Class Members' Motor Vehicle Records, derived in whole or part, from data maintained by the State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act;

    2) Using, processing, and disseminating, Plaintiffs' and Class Members' motor vehicle records for purposes that violate the DPPA;

    3) Re-disclosing by reselling Plaintiffs' and Class Members' motor vehicle records for purposes that violate DPPA;

    4) Using, directly or indirectly, Plaintiffs' and Class Members' motor vehicle records to market and solicit Plaintiffs' and Class Members', without their express consent, for purposes that violate the DPPA.

m) A permanent injunction enjoining and restraining Defendants, and all persons or entities acting in concert with them during the pendency of this action and thereafter perpetually, from:

    1) Obtaining, directly or indirectly, Plaintiffs' and Class Members' Motor Vehicle Records, derived in whole or part, from data maintained by the State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act;

    2) Using, processing, and disseminating, Plaintiffs' and Class Members' motor vehicle records for purposes that violate the DPPA;

    3) Re-disclosing by reselling Plaintiffs' and Class Members' motor vehicle records for purposes that violate DPPA;

    4) Using, directly or indirectly, Plaintiffs' and Class Members' motor vehicle records to market and solicit Plaintiffs' and Class Members', without their express consent, for purposes that violate the DPPA.

n)  For an award to Plaintiff and the Class of their costs and expenses of this litigation;

o)  For an award to Plaintiff and the Class for their reasonable attorneys' fees;

p)  An award to Class Members of damages, including but not limited to: compensatory, statutory, exemplary, aggravated, and punitive damages, as permitted by law and in such amounts to be proven at trial;

q)  For pre-and post-judgment interest as allowed by law; and

r)  For such other relief as the Court may deem just and proper.

Dated: December 27, 2013

Respectfully submitted,
LAW OFFICES OF JOSEPH H. MALLEY P.C.

By: s/Joseph H. Malley
1045 N. Zang Blvd.
Dallas, Texas 75208
Telephone: (214) 943-6100
Facsimile: (214) 943-6170
Malleylaw@gmail.com

Attorney for Plaintiffs Jane Doe, Toby Cross individually and on behalf of a class of similarly situated individuals

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: December 27, 2013

Respectfully submitted,
LAW OFFICES OF JOSEPH H. MALLEY P.C.

By: s/Joseph H. Malley
1045 N. Zang Blvd.
Dallas, Texas 75208
Telephone: (214) 943-6100
Facsimile: (214) 943-6170
Malleylaw@gmail.com

Attorney for Plaintiffs Jane Doe, Toby Cross
individually and on behalf of a class of similarly
situated  individuals